1    Robert C. Cheasty, Esq. # 85115
     Law Offices of Cheasty & Cheasty
2    1604 Solano Avenue
3    P.O. Box 8357
     Berkeley, CA 94707
4    Telephone: (510) 525-1000

5    Attorneys for Plaintiff

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11   JAMAL JACKSON; JANNIE MENDEZ,          NO.

12   Plaintiffs,

13   vs.                                    **COMPLAINT FOR DAMAGES FOR
                                            VIOLATION OF CIVIL RIGHTS.**
14
                                            **JURY TRIAL DEMANDED**
15   CITY AND COUNTY OF SAN
     FRANCISCO, a municipal corporation;
16   HEATHER FONG, in her capacity as
     Chief of Police for the CITY AND
17   COUNTY OF SAN FRANCISCO; JESSE
     SERNA, individually, and in his capacity
18   as a police officer for the CITY AND
     COUNTY OF SAN FRANCISCO; GARY
19   MORIYAMA, individually and in his
     capacity as a police officer for the CITY
20   AND COUNTY OF SAN FRANCISCO;
     and San Francisco police officers and
21   employees DOES 1 through 50, inclusive,

22   Defendants.

23

24

25

26

27

28

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

**INTRODUCTION**

On the afternoon of February 24, 2007, Plaintiff JAMAL JACKSON, a college student, was driving with his girlfriend, Plaintiff JANNIE MENDEZ, to the Red and White Fleet out of Pier 1 in San Francisco (along the Embarcadero) where they were to meet with some friends. On the way to meet their friends, another driver who was stuck in the late afternoon traffic took out his frustration on Jamal and others. This other driver became increasingly angry and eventually was overcome by road rage and in the process of venting his rage, and acting and driving in a hostile manner, he accosted Mr. JACKSON who defended himself.

Later, when Mr. JACKSON arrived at the pier parking lot where his friends worked, Mr. JACKSON went into the bathroom. When he emerged from the bathroom he observed a couple of police officers on the lot and was told that they were looking for someone who would have just arrived who was in some kind of dispute with another motorist. Mr. JACKSON approached the officers to explain that he might be the driver they sought and to explain to them what had transpired and to lodge a complaint against the other driver. When Mr. JACKSON reached the police he was accosted by Defendant OFFICER SERNA who placed him into handcuffs and then violently struck him and threw him onto the pavement and then further assaulted and battered him. This violence was wholly without provocation of cause. This was in the presence of others who were there, both those who had their cars parked in the lot, and those who worked there, and Mr. JACKSON'S girlfriend, Plaintiff JANNIE MENDEZ.

Defendant OFFICER SERNA then began to pepper spray onlookers, including Plaintiff Ms. MENDEZ, and to assault those in the vicinity and to continue to be physically abusive to Mr. JACKSON, who was at this point fearful for his safety. Mr. JACKSON eventually jumped up and ran from OFFICER SERNA and ran across the Embarcadero where he knelt down on the pavement

1   in front of the most public spot he could find, a coffee shop, to surrender himself to any other

2   police. He surrendered himself to another couple of officers who put him into their squad car. While

3   he was in the back seat of the police vehicle, and cuffed, OFFICER SERNA came up and got into

4   the back seat and began to assault and batter him again, and began verbally and physically abusing

5   him, making repeated racially derogatory and offensive remarks including repeatedly calling Mr.

6   JACKSON "nigger" and "boy" and "little bitch." Mr. JACKSON is African American.

7        San Francisco Police Officers, Defendants JESSE SERNA and GARY MORIYAMA both

8   participated in the false arrest and detention of the onlookers, including Plaintiff JANNIE

9   MENDEZ, with OFFICER SERNA using chemical sprays into the eyes of onlookers including

10  Plaintiff JANNIE MENDEZ, who was held in violation of her right to freedom and to remain free

11  from unwanted physical contact, assaults, batteries, arrest, detention and imprisonment by

12  OFFICER SERNA.

13       Plaintiffs JACKSON and MENDEZ observed OFFICER SERNA approached bystander

14  Shawn Myers, tell him that he was under arrest, and placed an arm bar on him. Joined by Officer

15  Moriyama, they violently manhandled Mr. Myers, threw him to the ground and arrested him. Mr.

16  Myers had done nothing to provoke any use of force or an arrest. As this event unfolded, Mr.

17  Myers' wife repeatedly asked the officers why they were arresting and manhandling her husband. In

18  response, Officer SERNA discharged his chemical spray into Sarah Myers' face, without warning

19  or provocation and in violation of department guidelines for such use and discharge. Officer

20  MORIYAMA both assisted Officer SERNA in his unlawful use of force and stood by and failed to

21  intervene in Officer SERNA's intolerable abuse of Plaintiff JACKSON and Plaintiff MENDEZ and

22  of Mr. and Ms. Myers. Defendant Officers DOES stood by and failed to intervene in Defendant

1   Officers SERNA's and MORIYAMA's intolerable abuse of Plaintiffs JACKSON, MENDEZ and the

2   others who were assaulted and abused by them.

3       Mr. JACKSON was incarcerated in the San Francisco County Jail for seven days, and is

4   currently fighting false criminal charges that have been pursued by the CITY AND COUNTY OF

5   

6   SAN FRANCISCO.

7       Defendant Officer JESSE SERNA is an officer for the San Francisco Police Department

8   who has repeatedly misbehaved as a police officer and despite that repeated misconduct, his

9   behavior has been allowed and permitted by the Defendants CITY AND COUNTY OF SAN

10  FRANCISCO and its Police Department and its directing personnel, including its Police Chief,

11  Defendant HEATHER FONG. This has redounded to the detriment of the public and to the

12  detriment of the rest of the police force who suffer reputation-wise from the terrible misconduct and

13  the physical abuse that Officer SERNA has repeatedly committed. His misconduct has been widely

14  publicized such that the Department and the officials of the CITY AND COUTY OF SAN

15  FRANCISCO, Defendants herein, all have been on notice of Mr. SERNA'S violations but have not

16  taken proper steps to protect the public from Officer SERNA'S conduct. Moreover Defendants

17  CITY AND COUTY OF SAN FRANCISCO and FONG and have continued to endorse the conduct

18  of SERNA and have still failed to take steps to properly discipline Officer SERNA, thereby further

19  condoning and ratifying his conduct and sending the message to the others in the police force that

20  this conduct will be tolerated. Attached hereto as Exhibits A, a group exhibit of prominent articles

21  including an Editorial in the San Francisco Chronicle, all highlighting the misconduct of Officer

22  SERNA, including the Editorial, that actually named SERNA, all putting the CITY AND COUNTY

23  OF SAN FRANCISCO and the Department on Notice.

24  

25  

26  

27  

28  

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

-4-

Defendant Officers later lied by falsely claiming in their police reports that that Plaintiff JAMAL JACKSON had resisted arrest, by falsely claiming that Plaintiff JAMAL JACKSON had assaulted and battered, by falsely claiming that bystanders Mr. and Mrs. Myers had threatened the officers, that Mrs. Myers had attempted to assault Officer SERNA, that Plaintiff JANNIE MENDEZ had acted in a way to justify the spraying of her with chemical spray, handcuffing her and arresting her. Despite being so assaulted and battered by Officer SERNA, being detained, being handcuffed, and carted off in a police vehicle, and being brought to Central Station for booking, no charges were filed against Plaintiff JANNIE MENDEZ.

## JURISDICTION

1. This action arises under Title 42 of the United States Code, Section 1983. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331 and 1343. The unlawful acts and practices alleged herein occurred in the City and County of San Francisco, California, which is within this judicial district.

## PARTIES

2. Plaintiff herein, JAMAL JACKSON, is and at all times mentioned herein was readily recognizable as an African-American man and he is a citizen of the United States residing in the City of Sacramento, County of Sacramento, California.

3. Plaintiff herein, JANNIE MENDEZ, is and at all times mentioned herein was readily recognizable as a Latina woman and she is a citizen of the United States residing in the City of San Francisco, California.

4. Defendant CITY AND COUNTY OF SAN FRANCISCO ("CITY") is a municipal corporation, duly organized and existing under the laws of the State of California. Under its authority, the CITY operates the San Francisco Police Department.

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5. At all times mentioned herein, Defendant HEATHER FONG ("FONG") was employed by Defendant CITY as Chief of Police for Defendant CITY. She is being sued in her official capacity as Chief of Police for Defendant CITY.

6. At all times mentioned herein, Defendant JESSE SERNA ("SERNA") was employed by Defendant CITY as a police officer. He is being sued in his official capacity as a police officer for Defendant CITY.

7. At all times mentioned herein, Defendant GARY MORIYAMA ("MORIYAMA") was employed by Defendant CITY as a police officer. He is being sued in his official capacity as a police officer for Defendant CITY.

8. Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs are informed and believe and based thereupon allege that each defendant so named is responsible in some manner for the injuries and damages sustained herein. Plaintiffs will amend their complaint to state the names and capacities of DOES 1-50, inclusive, when they have been ascertained.

9. In engaging in the conduct described herein, Defendant police officers acted under the color of law and in the course and scope of their employment with the City. In engaging in the conduct described herein, Defendant police officers exceeded the authority vested in them as police, in all the conduct described herein and in arresting and detaining Plaintiff MENDEZ and Plaintiff JACKSON.

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

## STATEMENT OF FACTS

10. On the afternoon of February 24, 2007, Plaintiff JAMAL JACKSON, a college student, and his girlfriend, Plaintiff JANNIE MENDEZ, drove to the Embarcadero, Pier One, near the Ferry Building, in San Francisco to meet with friends who worked there.

11. While Mr. JACKSON and his girlfriend Ms. MENENDEZ were on the way to Pier One, another driver who was stuck in the late afternoon traffic took out his anger and frustration on Jamal JACKSON and others. This other driver became overcome by road rage and in the process of venting his rage, and acting and driving in a hostile manner, he accosted Mr. JACKSON who defended himself.

12. When Mr. JACKSON and Ms. MENDEZ arrived at the Pier One parking lot where his friends worked, Mr. JACKSON went into the bathroom. When he emerged from the bathroom he observed a couple of police officers on the lot and was told that they were looking for someone who would have just arrived who was in some kind of dispute with another motorist. One officer, Defendant Officer SERNA, appeared very angry and was using profanity while looking around.

13. Mr. JACKSON approached the officers to explain that he might be the driver they sought and to explain to them what had transpired and to lodge a complaint against the other driver.

14. When Mr. JACKSON reached the two police officers he began to address them. He was suddenly accosted by Officer SERNA who placed him into handcuffs and then violently struck him and threw him onto the pavement and then further assaulted and battered him.

15. This assault and battery by Officer SERNA was in the presence of others who were there at the scene, including Mr. JACKSON's girlfriend, Plaintiff JANNIE MENDEZ , as well as bystanders who appeared to be waiting at the parking lot kiosk for their cars, and those who worked there, and others unknown to Plaintiffs.

16. Officer SERNA then began to pepper spray onlookers, including Plaintiff Ms. MENDEZ, and to be assaultive those in the vicinity and to assault and batter a bystander Mr. Shawn Myers, and to continue to be physically abusive to Mr. JACKSON, who began to genuinely fear for his safety, especially as Defendant Officer Gary MORIYAMA did nothing to stop Defendant Officer SERNA from physically harming and battering Mr. JACKSON and as Officer SERNA seemed intent on hurting Mr. JACKSON, and as SERNA showed no restraint in how he was conducting himself.

17. Fearing for his own safety, Mr. JACKSON eventually jumped up at a moment when SERNA had directed his attention to assaulting and pepper spraying people at the parking lot kiosk. Mr. JACKSON ran across the Embarcadero where he then stopped and knelt down on the pavement in front of the most public spot he could find, a coffee shop, to surrender himself to any other police.

18. Mr. JACKSON surrendered himself to another couple of officers who put him into their squad car. While he was in the back seat of the police vehicle, and cuffed, Defendant Officer SERNA came up and got into the back seat and assaulted and battered Mr. JACKSON again repeatedly, and verbally and physically abusing him, making repeated racially derogatory and grossly offensive remarks to Mr. JACKSON who is African American, humiliating Mr. JACKSON by using the words nigger and boy to Mr. JACKSON.

19. San Francisco Police Officers, Defendants JESSE SERNA and GARY MORIYAMA both participated in the false arrest and detention of the onlookers, including Plaintiff JANNIE MENDEZ, with Officer SERNA using chemical sprays into the faces of onlookers including Plaintiff JANNIE MENDEZ, who was held in violation of her right to freedom and to be free from

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

-8-

1  unwanted physical contacts and assaults, batteries, arrest and false imprisonment by Defendant

2  Officer SERNA and other Defendants in the San Francisco Police Department.

3      20. Plaintiffs JACKSON and MENDEZ observed Officer SERNA approach bystander

4  Shawn Myers, tell him that he was under arrest, and manhandle him. Joined by Officer Moriyama,

5  SERNA violently threw Mr. Myers to the ground and arrested him, in spite of the fact that Mr.

6  Myers had done nothing to provoke any use of force or an arrest. As this event unfolded, Mr. Myers'

7  wife, Sarah Myers repeatedly asked the officers why they were arresting and manhandling her

8  husband. In response, Officer SERNA sprayed his chemical spray into Sarah Myers' face, without

9  warning or provocation and in violation of department guidelines for such use and discharge.

10     21. Defendant Officer MORIYAMA both assisted Defendant Officer SERNA in his

11

12  unlawful use of force upon Plaintiffs and others at the scene, and stood by and failed to intervene in

13  Officer SERNA's inexcusable abuse of JAMAL JACKSON and JANNIE MENDEZ and of

14  bystanders Mr. and Mrs. Myers, causing great terror in the minds and hearts of Plaintiffs JACKSON

15  and MENDEZ. Defendant Officers DOES stood by and failed to intervene in Defendant Officers

16

17  SERNA's and MORIYAMA's intolerable abuse of Plaintiffs JACKSON, MENDEZ and the others

18  who were assaulted and abused by them, causing the obvious harm stated herein and, in addition,

19  causing great harm in the loss of confidence in the police as protectors of the public, protectors of

20  the peace, enforcers of the law and the safe public servants to whom the public can turn in times of

21

22  distress as well as for general aid and assistance. As a result of this police misconduct by Defendant

23  SERNA and the other Defendants, Plaintiff JACKSON and his family moved from San Francisco to

24  Sacramento out of fear of further assaults or batteries or harassment of violations of the legal and

25  constitutional rights of Mr. JACKSON and his family.

26     22. Mr. JACKSON was incarcerated in the San Francisco County Jail for seven days, and is

27

28

1  currently fighting false criminal charges which have been pursued by the CITY AND COUNTY OF

2  SAN FRANCISCO.

3      23. Defendant OFFICER JESSE SERNA is an officer for the San Francisco Police

4  Department who has repeatedly misbehaved in his acts as a police officer. Despite that repeated

5  misbehavior, his conduct has been allowed and permitted by the Department to the detriment of the

6  public and to the detriment of the rest of the police force who suffer reputation-wise by the terrible

7  conduct and the physical abuse committed by Defendant OFFICER SERNA. This misbehavior has

8  

9  been brought repeatedly to the attention of the Defendant CITY AND COUNTY OF SAN

10 FRANCISCO. The misconduct of Defendant OFFICER SERNA has been so notorious that it has

11 been publicized far and wide and has become a public disgrace, being the subject of numerous

12 articles and pieces in the news media in San Francisco, such that it has come to the attention

13 

14 repeatedly of the officials of the Defendant CITY AND COUNTY OF SAN FRANCISCO, putting

15 them on notice of the problem. Plaintiffs are informed and believe that SERNA has been repeatedly

16 at the top of all lists of police officers in San Francisco for excessive use of force and that

17 SERNA'S appearance on the CITY'S "Watch List" for officers using force in excess of three times

18 per quarter started in 1997 and has continued since that year with both reported and unreported uses

19 

20 of force, causing injuries and hospitalizations repeatedly to those whom he arrested. Further,

21 Plaintiffs are informed and believe that Defendant POLICE CHIEF HEATHER FONG has been

22 

23 alerted to this problem with Serna and has both refused to comment when asked about it and also

24 generically defended it and excused it. In spite of being on such notice about Defendant SERNA,

25 Defendants CITY AND COUNTY OF SAN FRANCISCO have not taken proper steps to control

26 Defendant OFFICER SERNA and to protect the public from Officer SERNA's conduct. Moreover

27 Defendants CITY AND COUNTY OF SAN FRANCISCO and FONG and have continued to

28

1   endorse the conduct of SERNA and have still failed to take steps to properly discipline Officer

2   SERNA, thereby further condoning and ratifying his conduct and sending the message to the others

3   in the police force that this conduct will be tolerated. Attached hereto as Exhibits A, a group exhibit

4   of prominent articles, including even an Editorial in the San Francisco Chronicle citing Defendant

5   SERNA by name, all reporting the abominable record of misconduct of Officer SERNA and putting

6   the City and the Department on Notice.

7
8        24. Defendant Officers SERNA and MORIYAMA later lied by claiming in their police

9   reports that that Plaintiff JAMAL JACKSON had resisted arrest, that Plaintiff JAMAL JACKSON

10   had assaulted and battered the officers, that bystanders Mr. and Ms. Myers had threatened the

11   officers, that Ms. Myers had attempted to assault Officer SERNA, that Plaintiff JANNIE MENDEZ

12   had acted in any way to justify the spraying of her with chemical spray (pepper spray) which

13   Defendant SERNA claimed was warranted.

14
15        25. Plaintiff JAMAL JACKSON was falsely arrested and battered as described herein and

16   charged with among other things resisting arrest and various other false charges designed to cover

17   up the outrageous conduct of Defendant SERNA and the other Defendants.

18
19        26. Plaintiff JANNIE MENDEZ was falsely arrested on charges designed to cover up the

20   illegal acts of Defendant SERNA and the other Defendants, including among other things, resisting,

21   obstructing or delaying a police officer in the performance of duty. Plaintiff JANNIE MENDEZ

22   was chemically sprayed and handcuffed at the scene. She was then placed in the rear of a police

23   vehicle and transported to Central Station, where she was detained in handcuffs. She was eventually

24   released. No charges were brought against JANNIE MENDEZ.

25
26
27
28

27. The arrest of Plaintiffs JAMAL JACKSON and JANNIE MENDEZ on or about February 24, 2007 was malicious, wanton and was done without any just provocation or cause, proximately causing Plaintiffs' damages.

28. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of all attorneys' fees incurred in relation to this action for violation of their civil rights.

29. As a proximate result of defendants' conduct, plaintiffs suffered severe and extreme emotional distress, fear, terror, anxiety, humiliation, and loss of his sense of security, dignity, and pride as a United States citizen.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. Section 1983)**
**(Against Defendant Officer SERNA, and DOES 1-10)**

30. Plaintiffs hereby re-allege and incorporate by reference herein paragraphs 1 through 29 of this Complaint.

31. In doing the acts complained of herein, Defendants SERNA, MORIYAMA and DOE5 1 through 15, inclusive, and/or each of them, acted under color of law to deprive Plaintiff of certain constitutionally protected rights, including, but not limited to:

a. The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. section 1983)**
**(Against Defendants CITY, HEATHER FONG, and DOES 16-30)**

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

32. Plaintiffs hereby re-allege and incorporate by reference herein paragraphs 1 through 31 of this Complaint.

33. Plaintiffs are informed and believe and thereon allege that high ranking City of San Francisco officials, including high ranking police supervisors, such as Defendant HEATHER FONG, DOES 16 through 30, and/or each of them, knew and/or reasonably should have known about the repeated acts of misconduct by defendant Officers SERNA, MOIUYAMA, and DOES 1-15 and/or each of them.

34. Despite having such notice, Plaintiffs are informed and believe and thereon allege that Defendants FONG, DOES 16-30, and/or each of them, approved, ratified, condoned, encouraged, and/or tacitly authorized the continuing pattern and practice of misconduct and/or civil rights violations by said officers.

35. Plaintiffs are further informed and believes and thereon alleges that as a result of the deliberate indifference, reckless and/or conscious disregard of the misconduct by Defendants SERNA, MORIYAMA and DOES 1-15, and/or each of them, Defendants FONG, DOES 16-30 and/or each of them, encouraged these officers to continue their course of misconduct, resulting in the violation of the Plaintiffs' rights as alleged herein.

36. The aforementioned acts and/or omissions and/or deliberate indifference by high ranking City and County of San Francisco officials, including high ranking City and County of San Francisco Police Department supervisors, Defendants FONG, DOES 16-30, and each of then resulted in the deprivation of Plaintiffs' constitutional rights including, but not limited to, the following:

a. The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

37. These rights are substantive guarantees under the Fourth and/or Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION
### (42 U.S.C. section 1983)
### (Against Defendant CITY AND COUNTY OF SAN FRANCISCO)

38. Plaintiffs hereby reallege and incorporate by reference herein paragraphs 1 through 37 of this Complaint.

39. As against Defendant CITY, Defendant FONG and/or DOES 16-30 in her/their capacity as official policy-maker(s) for the CITY AND COUNTY OF SAN FRANCISCO, plaintiffs further allege that the acts and/or omissions alleged in the Complaint herein are indicative and representative of a repeated course of conduct by members of the CITY AND COUNTY OF SAN FRANCISCO Police Department tantamount to a custom, policy or repeated practice of condoning and tacitly encouraging the abuse of police authority, and disregard for the constitutional rights of citizens.

40. Plaintiffs are further informed and believe and thereon allege that the acts and omissions alleged herein are the direct and proximate result of the deliberate indifference of Defendants CITY, FONG, DOES 16-30, and each of them, to repeated acts of police misconduct which were tacitly authorized, encouraged or condoned by the Defendant CITY, Defendant FONG, DOES 16-30, and each of them.

41. The injuries and damages to Plaintiffs as alleged herein were the foreseeable and proximate result of said customs, policies, patterns and/or practices of Defendant CITY, Defendant FONG, DOES 16-30, and each of them.

42. Plaintiffs are further informed and believe and thereon allege that the damages sustained as alleged herein were the direct and proximate result of municipal customs and/or policies of deliberate indifference in the training, supervision and/or discipline of members of the Defendant SAN FRANCISCO Police Department.

43. Plaintiffs are further informed and believe and upon such information and belief allege that Plaintiffs' damages and injuries were caused by customs, policies, patterns or practices of Defendant CITY. Defendant FONG, DOES 16-30. and each of them, of deliberate indifference in the training, supervision and/or discipline of Defendant SERNA, MORIYAMA, DOES 1-15, and/or each of them

44. The aforementioned customs, policies or practices of Defendant CITY, Defendant FONG, DOES 16-30, and each of them, resulted in the deprivation of Plaintiffs' constitutional rights including, but not limited to, the following:

a. The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

45. These rights are substantive guarantees under the Fourth and/or Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**(Assault and Battery)**
**(Against Defendants SERNA, MORIYAMA and DOES 1-15)**

46. Plaintiffs reallege and incorporate by reference herein paragraphs I through 45 of this Complaint.

47. Defendants SERNA, MORIYAMA and DOES 1-15, inclusive, placed Plaintiffs in immediate fear of death and severe bodily harm by attacking and battering them without any just provocation or cause

48. These defendants' conduct was neither privileged nor justified under statute or common law.

49. As a proximate result of defendants' conduct, Plaintiffs suffered damages as hereinafter set forth.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**(False Imprisonment)**
**(Against Defendants SERNA, MORIYAMA and DOES 1-15)**

50. Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 49 of this Complaint.

51. Defendants SERNA, MORIYAMA and DOES 1 - 15, inclusive, falsely imprisoned Plaintiffs without probable cause. Plaintiffs had not committed any of the crimes with which they was cited, and there was no basis upon which defendants could have reasonably believed that plaintiffs had committed any of the crimes with which they were cited.

52. Defendants SERNA, MORIYAMA and DOES 1 - 15, inclusive, failed to observe proper procedures in falsely imprisoning Plaintiffs without probable cause, These defendants exceeded the limits of their authority as police officers in falsely imprisoning the plaintiffs without probable cause, and in using excessive and unnecessary force against plaintiffs while they falsely imprisoned them.

53. As a proximate result of defendants' conduct, Plaintiffs suffered damages as hereinafter set forth.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### (Against Defendants SERNA, MORIYAMA and DOES 1-15)

54. Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 53 of this Complaint.

55. The conduct of Defendants SERNA, MORIYAMA and DOES 1-15, inclusive, as set forth herein, was extreme and outrageous and beyond the scope of conduct which should be tolerated by citizens in a democratic and civilized society. Defendants committed these extreme and outrageous acts with the intent to inflict severe mental and emotional distress upon Plaintiffs.

56. As a proximate result of Defendants' willful, intentional and malicious conduct, plaintiffs suffered severe and extreme mental and emotional distress. Therefore, Plaintiffs are entitled to an award of punitive damages as against said defendants. Plaintiffs have suffered damage is hereinafter set forth.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)
### (Against Defendants SERNA, MORIYAMA and DOES 1-15)

57. Plaintiffs reallege and incorporate by reference herein paragraphs I through 56 of this complaint, except for any and all allegations of intentional, malicious, extreme, outrageous, wanton, and oppressive conduct by defendants, and any and all allegations requesting punitive damages.

58. The wrongful conduct of Defendants SERNA, MORIYAMA and DOES 1-15, inclusive, as set forth herein, constitutes negligent conduct done with conscious disregard for the rights of Plaintiffs.

59. As a proximate result of Defendants' negligent conduct. Plaintiffs have suffered severe emotional and mental distress, having a traumatic effect on Plaintiffs' emotional tranquility.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**EIGHTH CAUSE OF ACTION**
**(Violation of Civil Code Section 51.7)**
**(Against Defendants SERNA, MORIYAMA and DOES 1-15)**

60. Plaintiffs reallege and incorporate by reference herein paragraphs I through 59 of this complaint.

61. Plaintiffs are informed and believes and thereon allege that the conduct of Defendants SERNA, MORIYAMA and DOES 1-15, inclusive, as described herein, was motivated by racial prejudice against Plaintiffs. Plaintiff JAMAL JACKSON is and was readily recognizable as African-American and Plaintiff MENDEZ is recognizable as Latina. In engaging in such conduct, defendants violated Plaintiffs' rights under California Civil Code Section 51.7 to be free from violence, or intimidation by threat of violence committed against them because of the races of plaintiffs.

62. Under the provisions of California Civil Code Section 52(b), Defendants are liable for each violation of Civil Code Section 51.7 for punitive damages, an additional $25,000.00, and for reasonable attorney's fees.

63. As a proximate result of defendants' wrongful conduct, plaintiffs suffered damages as hereinafter set forth.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

---

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### NINTH CAUSE OF ACTION
#### (Violation of Civil Code Section 52.1)
#### (Plaintiff against Defendants SERNA, MORIYAMA,
#### CITY AND COUNTY OF SAN FRANCISCO and DOES 1-15)

64. Plaintiffs real allege and incorporate by reference herein paragraphs 1 through 63 of this Complaint.

65. The conduct of Defendants SERNA, MORJYAMA and DOES 1 - 10, inclusive, as described herein, acting in the course and scope of their employment for Defendant CITY, violated California Civil Code Section 52.1, in that they interfered with Plaintiffs' exercise and enjoyment of their civil rights, through use of wrongful and excessive force, and failure to make any proper or reasonable detention of said Plaintiffs.

66. As a direct and proximate result of Defendants' violation of Civil Code Section 52.1. Plaintiffs suffered violations of their constitutional rights, and suffered damages as set forth herein.

67. Since this conduct occurred in the course and scope of their employment, Defendant CITY AND COUNTY OF SAN FRANCISCO is therefore liable to Plaintiffs pursuant to respondeat superior.

68. Plaintiffs are entitled to injunctive relief and an award of his reasonable attorney's fee: pursuant to Civil Code Section 52.1(h).

WHEREFORE, Plaintiffs pray for relief, as hereinafter set forth.

### TENTH CAUSE OF ACTION
#### (Negligence)
#### (Against Defendants SERNA, MORIYAMA,
#### CITY AND COUNTY OF SAN FRANCISCO and DOES 1-15)

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.

69. Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 68 of this complaint, except for any and all allegations of intentional, malicious, extreme, outrageous, wanton, and oppressive conduct by defendants, and any and all allegations requesting punitive damages.

70. At all times herein mentioned, Defendants SERNA, MORIYAMA and DOES 1 - 15, inclusive, were subject to a duty of care to avoid causing unnecessary physical harm and distress to persons through their use of force and making of arrests. The wrongful conduct of Defendants, as set forth herein, did not comply with the standard of care to be exercised by reasonable persons, proximately causing plaintiffs to suffer injuries and damages as set forth herein. Pursuant to Government Code Section 815.2(a), Defendant CITY AND COUNTY OF SAN FRANCISCO is vicariously liable to Plaintiffs for their injuries and damages suffered as alleged herein, incurred as a proximate result of the aforementioned wrongful conduct of Defendants.

71. As a proximate result of Defendants' negligent conduct, Plaintiffs suffered severe physical injury, severe emotional and mental distress, injury having a traumatic effect on Plaintiffs' emotional tranquility, and suffered damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION
### (Negligent Hiring, Retention, Training, Supervision, and Discipline)
### (Against Defendants CITY and DOES 16-30)

72. Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 71 of this Complaint, except for any and all allegations of intentional, malicious, extreme, outrageous, wanton, and oppressive conduct by defendants, and any and all allegations requesting punitive damages.

73. At all times herein mentioned, defendant CITY AND COUNTY OF SAN FRANCISCO, by and through its supervisory employees and agents, DOES 16-30, inclusive, has and had a

---

mandatory duty of care to properly and adequately hire, train, retain, supervise, and discipline its police officers so as to avoid unreasonable risk of harm to citizens. With deliberate indifference, CITY and DOES 16-30, inclusive, failed to take necessary, proper, or adequate measures in order to prevent the violation of plaintiffs' rights and injury to said plaintiffs. CITY AND COUNTY OF SAN FRANCISCO and DOES 16-30, inclusive, breached their duty of care to citizens in that CITY AND COUNTY OF SAN FRANCISCO and DOES 16-30, inclusive, failed to adequately train its police officers, including Defendants SERNA, MORIYAMA and DOES 1-15, inclusive, in the proper and reasonable use of force, the proper and reasonable making of detentions, and treating citizens in a manner that is not racially discriminatory, and/or failed to have adequate policies and procedures regarding the proper and reasonable use of force, the proper and reasonable making of detentions, and treating citizens in a manner that is not racially discriminatory. This lack of adequate supervisorial training, and/for policies and procedures demonstrates the existence of an informal custom or policy of promoting, tolerating, and/or ratifying the continuing use of excessive and unreasonable force by police officers employed by CITY AND COUNTY OF SAN FRANCISCO, the continuing failure to make proper and reasonable detentions by police officers employed by CITY AND COUNTY OF SAN FRANCISCO, and continuing racially discriminatory behavior towards citizens by police officers employed by the CITY AND COUNTY OF SAN FRANCISCO.

74. As a proximate result of defendants CITY AND COUNTY OF SAN FRANCISCO and DOES 16-30, inclusive's negligent conduct, plaintiffs suffered severe physical injury, severe emotional and mental distress, injury having a traumatic effect on Plaintiffs' emotional tranquility, and suffered damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**JURY DEMAND**

75. Plaintiffs hereby demand a jury trial in this action.

**PRAYER**

WHEREFORE, Plaintiffs pray for relief, as follows:

FOR PLAINTIFF JAMAL JACKSON:

For general damages in a sum of $l,000,000.00;

For special damages in a sum according to proof;

For punitive damages in a sum according to proof;

For injunctive relief enjoining Defendant CITY AND COUNTY OF SAN FRANCISCO from authorizing, allowing, or ratifying the practice by any police officer employee of Defendant CITY from using excessive and unreasonable force against persons, pursuant to California Civil Code Section 52. ;

For violation of California Civil Code Sections 52 and 52.1, statutory damages, and reasonable attorney's fees;

For violation of California Civil Code Section 51.7 pursuant to California Civil Code section 52(b), punitive damages against Defendant police officers, $25,000.00 for each offense and reasonable attorney's fees;

For reasonable attorney's fees pursuant to 42 U.S.C. Section 1988;

For cost of suit herein incurred; and

For such other and further relief as the Court deems just and proper.


FOR PLAINTIFF JANNIE MENDEZ:

For general damages in a sum of $l,000,000.00;

For special damages in a sum according to proof;

For punitive damages in a sum according to proof;

For injunctive relief enjoining Defendant CITY AND COUNTY OF SAN FRANCISCO from authorizing, allowing, or ratifying the practice by any police officer employee of Defendant CITY from using excessive and unreasonable force against persons, pursuant to California Civil Code Section 52. ;

For violation of California Civil Code Sections 52 and 52.1 , statutory damages, and reasonable attorney's fees;

For violation of California Civil Code Section 51.7 pursuant to California Civil Code section 52(b), punitive damages against Defendant police officers, $25,000.00 for each offense and reasonable attorney's fees;

For reasonable attorney's fees pursuant to 42 U.S.C. Section 1988;

For cost of suit herein incurred; and

For such other and further relief as the Court deems just and proper.


Date: April 7, 2008                                    Law Offices Of Cheasty & Cheasty


_____
Robert C. Cheasty
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS.



This article appeared on page A - 1 of the San Francisco Chronicle

## The Use of Force
## Counting without consequence

### Police system of tracking is outdated, often ignored

Susan Sward and Elizabeth Fernandez, Chronicle Staff Writers
Monday, February 6, 2006

The San Francisco Police Department relies on an outmoded system to identify misconduct by its officers, and when the system does find warning signs, they are often ignored.

As a result, officers whose records clearly show a propensity for violence remain on the streets.

The Chronicle's investigation found:

-- The department's system for monitoring the use of force relies on thousands of paper records filed at headquarters and at stations across the city, making it difficult to review an officer's record or analyze trends. Other large departments -- including Miami-Dade, Pittsburgh and Phoenix -- use computer-based systems.

-- Officers are required to report when they use force, but not all do. The Chronicle found significant incidents when force was used and not logged, including cases where the city paid thousands of dollars to settle lawsuits.

-- The department acknowledges that repeated use of force is a warning sign and keeps a watch list of officers who report using force three or more times in a quarter. But dozens of officers appear again and again on that list.

-- There is a separate system for keeping track of officers who get frequent citizen complaints, but it recently lapsed for more than a year without anyone asking about it.

-- The system's weaknesses have been the subject of highly critical reports from outside the department, but city elected officials have failed to successfully press for changes in the way the department deals with problem officers.

San Francisco began monitoring the use of force by officers in 1985, four years after the U.S. Civil Rights Commission called on police agencies to create early warning systems to identify "violence-prone officers."

The tracking system requires officers to report any injury to a suspect, or any time they hit someone or use pepper spray, a choke hold or firearm.

Supervisors log the information on paper forms. Twice a month, copies are sent to the department's internal affairs unit.

In 20 years, while many other cities modernized their systems for monitoring officers' conduct, San Francisco did not computerize. Sergeants continue to fill out paper forms. Station captains still send them downtown. One of the most important tools that police departments have to curb the use of excessive force -- knowledge -- remains buried in paperwork.

A computerized tracking system is essential to effectively monitor officers' conduct, said Erwin Chemerinsky, a Duke University law professor who studied the Rampart corruption scandal in the Los Angeles Police Department in the late 1990s. Without one, he said, "there is not a way to identify problem officers or even get a sense of the overall problem."

The Police Department says it intends to computerize its system of tracking officers and is making plans to do so.

Chief Heather Fong says she believes San Francisco officers take the force reporting requirements so seriously that they overreport.

Database covers 9 years of force reports

What could San Francisco learn if it used computers to track and analyze the information it now keeps in file cabinets?

The Chronicle created a database of 8,601 logged uses of force in the department from 1996 through 2004.

In a department of about 2,200 officers, the database showed, two-thirds to three-quarters reported no use of force at all in any given year.

At the other extreme, the database showed, just 100 officers were responsible for 25 percent of all the force reported over those years.

Because it is a "paper and pencil" department, the San Francisco Police Department does not have ready access to this kind of information. It also can't quickly identify the officers who log the greatest use of force, year after year.

The Chronicle database, for example, shows **Officer Jesse Serna** logged more force -- 59 incidents -- than any other officer in the nine years studied by The Chronicle.

The database also identified officers who were reporting the use of force at what should have been an alarming pace. Officer Anthony Nelson, for instance, recorded 28 incidents in just his first three years.

Neither **Serna** nor Nelson responded to requests for comment.

Without a computerized database, the department relies primarily on its watch list of officers who report using force three or more times in a calendar quarter and acknowledges that when officers' names appear repeatedly on the list, that is something that needs to be looked into.

The watch list is sent every three months to commanders of units in which officers operate on the streets. Recently, the department says, it began including on that list the number of times officers had previously been on the list in

the past five years.

The Chronicle's database revealed the names of 28 officers who appeared on the watch list three or more times. **Serna** made the list nine times.

The department says a high number of incidents involving force is not an automatic indicator that an officer has a problem.

"You have to look at where an officer works and what kind of work he or she is doing," said Capt. Charles Keohane, the head of the risk management unit, which was established in 2003 to make the department more accountable on matters of discipline and less liable to civil suits. "You have to look at the assignment of these officers."

The Chronicle's database showed that some of the heaviest users of force did work in high-crime districts such as the Tenderloin, where frequent confrontations might be expected.

But it also showed that those officers still recorded far more force than other officers working the same high-crime areas.

Other high users of force worked in districts with lower crime rates, the database showed. They, too, recorded more violence than their peers.

Keohane said supervisors are supposed to review incidents involving San Francisco officers identified as frequent force users and counsel them when appropriate. Because of state privacy laws, there is no way of knowing how faithfully this rule is followed.

Frequent use of force, however, is not grounds for discipline.

Dan Lawson, a captain who retired in 2003 after more than 30 years with the department, said he never thought it was seriously concerned about tracking the use of force.

"It appeared the reporting process was there just to say we were doing something," said Lawson, who now is public safety director at the University of San Francisco. "It is my impression that after the force information was filed and logged, it was easily forgotten.

"I know Chief (Heather) Fong is dedicated to improving this situation," he added.

A year without early warning lists

In the mid-1990s, the department added a second way to track officers whose behavior might indicate problems: an early warning list of officers with frequent citizen complaints. It was compiled by the Office of Citizen Complaints.

Again, however, San Francisco failed to keep up.

While the city continued to count only civilian complaints, the U.S. Justice Department expanded the list of indicators that departments should track to include as many as 18 factors such as lawsuits against officers, sick leave patterns, incidents of spousal abuse, even their involvement in car chases.

In June, in response to questioning by the Police Commission, Kevin Allen, director of the Office of Citizen Complaints, revealed that the agency had stopped forwarding the early warning lists to the department and the commission more than a year before, because Allen thought the system was being changed.

A year went by with no one missing them. When police commissioners finally asked why they no longer received

those lists, Allen started sending them again.

Upgrading system takes money, expertise

The shortcomings of the monitoring system have been sharply criticized.

In 2003, the city controller's office issued a critical report that said the department collected too little data on officers' conduct and did not computerize what it did collect.

Those failings, the report concluded, made the department incapable of generating "reports showing cumulative data or trends, either for individual officers or for the department as a whole."

More than two years later, the department says it is going to upgrade its monitoring system but that it will take until the end of the year to accomplish this.

Upgrading the system will require a great deal of money and technical expertise that the department does not have, Capt. Keohane told the Police Commission in June.

In an interview, Keohane said the department planned to computerize its system and expand it to track lawsuits and other aspects of officers' records, in addition to their use-of-force and citizen complaints.

Before it can put in place a new tracking system, the department will need more than money. It must also negotiate the changes with the Police Officers Association, which is entitled to meet and confer on all amendments to work rules.

Gary Delagnes, president of the association, said he believes an early warning system is beneficial to officers as well as the department, but indicated that the association and department aren't in total agreement on the proposed changes.

Delagnes said he thinks the current early warning system is oppressive, in that it requires counseling for officers who are the subjects of citizen complaints, even before those complaints are evaluated for merit.

"That's wrong," he said. "It's not fair to the officer, not fair to the future of the officer, not fair down the road when that officer goes for a promotion and three or four complaints are waved in his or her face when in fact it was proper conduct in all four occasions."

One of the new warning indicators the department wants to track is an officer's record of charging suspects with resisting arrest, Delagnes said. Critics have argued that police often use this charge as cover when they use excessive force on a suspect.

Delagnes said he believes tracking resisting-arrest charges would unfairly punish officers in high-crime areas who often meet great resistance when they try to arrest people.

Keohane said it is not a simple matter to assess whether any incident indicates a deeper problem with an officer's conduct. When the city pays a large sum to settle a lawsuit, for example, "the officer may not have done anything out of policy, but for one reason or another," he said, the city decided to settle.

But, he said, once a new, comprehensive system is in place, the department will have a much greater ability to identify problem conduct before it becomes established.

"We are serious about this," Fong said. "We feel that the better the monitoring and tracking, the better we will be able to identify patterns and hopefully prevent officers from becoming involved in misconduct that needs to result

in discipline."

Attitudes must change to improve tracking

Experts in police work say that a tracking system curbs excessive force only if a department acts on the information.

Samuel Walker, who has advised the U.S. Justice Department on use-of-force issues, said, "Once a use-of-force incident occurs, it has to be reported by the officer, investigated by the proper supervisors, and if misconduct has occurred, disciplinary action must be taken."

Merrick Bobb, who heads the Police Assessment Resource Center in Los Angeles, which advises many police agencies on good practices, said departments must move firmly against officers who use excessive force.

They must form "individually tailored plans to rectify those officers' behavior and save their careers if possible, or discipline or terminate them if necessary," he said.

Critics of the department, as well as some of its members, say that more than new rules is needed. City officials need to insist that the department discipline its own.

"In the end, you can make all the rules you want, but if there isn't the political will to enforce those rules, you won't get where you need to be," said John Crew, a lawyer who served 15 years as director of the American Civil Liberties Union's police practices project in Northern California.

"The culture of the department," he said, "is, 'Yes, we know who the bad guys are, but we are not motivated enough to go after them.'

"What is sorely lacking is a sustained political commitment requiring the Police Department to hold its officers accountable on issues of force and other misconduct."

Within the department, several command-level officers said in interviews that the department had a history of failing to crack down on violent offenders, but they declined to be identified for fear it would damage their careers.

A former deputy chief, John Willett, who retired in 1999, said discipline often was influenced by behind-the-scenes pressure on the chief and Police Commission from the Police Officers Association and other groups trying to reduce the severity of penalties.

"I saw several officers who should have been terminated," he said. Because of the lobbying influence of various interest groups and highly skilled legal representation, "these officers were protected and remained in the department."

Chronicle researcher Lois Jermyn contributed to this report.

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/02/06/MNUFMAIN.DTL

This article appeared on page A - 1 of the San Francisco Chronicle



(This article appeared on page A - 1 of the San Francisco Chronicle)

**The Use of Force**
**Two heavy users of force end group's night out on the town**
Susan Sward, Bill Wallace and Elizabeth Hernandez, Chronicle Staff Writers
Monday, February 13, 2006

The Duthie brothers and their sister Alison, who had grown up in the suburbs, were in San Francisco for a night of celebration when they met two of the Police Department's most frequent users of force.

Alison had just returned to the Bay Area from the East Coast after recuperating from two surgeries for spinal tumors. Brothers Josh and Brooke, both fashion models, wanted to welcome their 22-year-old sister with a fun night on the town.

After taking in a show at a North Beach comedy club with friends, the Duthies chose to end the evening at Polly Esther's, a '70s- and '80s-themed dance club in the Tenderloin that catered to a late-night crowd of people in their 20s.

It was there on a May 1999 night that the Duthies and friends in their party met San Francisco police Officers Marcus Bronfeld and **Jesse Serna.**

Brooke Duthie said that where he grew up, in Contra Costa County, you wanted the police to come when there was trouble.

But outside Polly Esther's that night, the 24-year-old Duthie said, he learned that "in San Francisco, that's the last thing you'd ever want."

The events that unfolded that night shouldn't have happened. The records of Bronfeld and **Serna** were sitting in file cabinets at police headquarters. Together, they told a story of two men who were rookies together in June 1995 and who quickly began using force.

By May 30, 1999, the night of the incident at Polly Esther's, Bronfeld and **Serna** each had reported using force 22 times since January 1996, more than any other officer during that period, according to The Chronicle's analysis of police logs.

**Serna** had reported using force so frequently that four times he made the department's internal watch list of officers who may need counseling. He had reported injuring 11 people.

Bronfeld had been on the watch list three times and had reported injuring nine people, according to department records, from which The Chronicle assembled a database on force reported by officers from 1996 through 2004.

After the incident, **Serna** would continue adding to his record. By the end of the nine-year period analyzed by The Chronicle, he was by far the highest reported user of force in the 2,200-officer department. The 57 incidents he reported through 2004 were 50 percent more than the next highest officer's.

Five more times, **Serna** made the internal watch list of officers who use force frequently, making his total of nine the highest in the department by a large margin. He injured 20 more people, sending two to the hospital, according to a Chronicle review of police incident reports, for a total of 31.

He remains on the job.

**Police Chief Heather Fong declined in an interview to discuss the records of any individual officers or incidents involving them.**

**She did say that force is often a part of police work when suspects resist arrest and that the department makes an effort to keep force to a minimum.**

**Officer Serna** did not respond to requests for comment on this story. Bronfeld, who has left the department, described himself as a good, aggressive officer.

2 reports in 6 months

Thirty-year-old Jesse **Serna** wasn't done with his one-year probation when he reported using force the first time. In May 1996, he responded to a woman's call that her teenage son was out of control.

The mother later wrote a statement that **Serna** and another officer were so violent with her son that she had to call 911 for help. The police report made no mention of any injuries to the youth, but the mother said his arm was hurt.

Six months later, **Serna** recorded his second use of force, and from there he went about establishing himself as the department's No. 1 reported user of force.

Often, it was a relatively small thing that attracted **Serna**'s attention -- a mentally disturbed man kicking a newspaper rack or a car blocking traffic in front of a nightclub. Other times, it was more serious -- a report of men fighting with weapons or a tip about gang members harassing a bar owner. Often, **Serna**'s response to situations involved a violent struggle with suspects.

On Nov. 5, 1996, it was a double-parked car in Japantown. Julia Green, 43, who worked in the maritime industry, was waiting for a parking space to open up near her apartment.

When **Serna** pulled alongside in his patrol car, Green recalled in a telephone interview, "He asks me what I'm doing, and I said, 'I'm trying to park my car.' And he tells me, 'Well, I don't like your attitude.' It just sort of escalated from there."

Green said she got out of her car to carry her belongings to her apartment steps. When she told a man parked nearby that she would protest any ticket **Serna** gave her, she said, **Serna** suddenly was "behind me bending my arm and trying to throw me down."

"I wouldn't go down," she said. "Finally, when we got on the sidewalk, I went down."

**Serna** charged her with impeding traffic, battering a police officer and resisting arrest. Green complained to the Office of Citizen Complaints and sued.

The Office of Citizen Complaints ruled that **Serna**'s actions were consistent with department rules for using force and with accepted police practices.

An expert hired by Green's lawyer disagreed. Frank Saunders, a former training officer for the Santa Monica police, wrote:

"The arbitrary levels of physical force directed toward Julia Green ... during this basically 'contempt-of-cop' arrest were excessive and totally unwarranted."

Green's criminal charges were later dismissed, and the city settled her suit for $10,000. The department says such settlements do not necessarily indicate police misconduct.

**Green has moved out of state. Because of her fear of the police, she said, she didn't want the state or her job identified.**

Failing to report use of force

In the spring of 1997, **Serna** made his first appearance on the department's watch list of officers who report using force three or more times in a calendar quarter.

Supervisors are supposed to review the records of officers who make that list and counsel them when appropriate. It can't be known if **Serna** was counseled, because the Police Department would not comment on the records of individual officers.

In the next two years, **Serna** recorded 17 more uses of force while he worked the streets of the Tenderloin. Several suspects he arrested required hospital treatment for cuts, scrapes, soft tissue injuries and the effects of pepper spray.

He made the watch list three more times -- in 1997, 1998 and 1999.

On March 22, 1999, **Serna** used force but did not report it.

Darryl Brown, 24, said **Serna** and his partner, Eric Tapang, stopped him when he was walking through the Tenderloin on his way home from work.

The police report said Brown approached the officers with his fists clenched, but no charges were filed.

Brown later sued, saying that when he tried to show identification, **Serna** slapped his wallet from his hand and he and Tapang grabbed Brown's arms and handcuffed him.

**Serna** began to punch Brown and call him "n -- " while Tapang pulled Brown's arms back, wrenching his muscles, the lawsuit stated; then, the two officers "drove him aimlessly around the Tenderloin" as **Serna** continued to call him "n -- ."

Brown, who received a $10,000 settlement from the city, also complained to the Office of Citizen Complaints.

When **Serna** next reported using force, coming to the aid of Bronfeld outside Polly Esther's, Brown's complaint was pending.

An officer's son

Marcus Bronfeld, 24, joined the force the same month as Jesse **Serna**, in June 1995. Like **Serna**, he was still on probation when he reported his first use of force, in a confrontation near the Civic Center.

It occurred Feb. 27, 1996, when Bronfeld hit Fabio DeFelice three times with his fist during a confrontation, according to the police report. DeFelice sued, saying he was assaulted without reason, and an arbitrator awarded him $15,000 in damages.

Bronfeld went 13 months before logging his next use of force. After that, he reported cases with a frequency that soon identified him as one of the department's most force-prone officers.

In June 1997, Lolita Mills, the mother of a 19-year-old who had encountered Bronfeld twice, filed a citizen's complaint against him. It would be the officer's first sustained complaint.

In both encounters, Mills said in an interview, Bronfeld picked out her son, Eron, in a crowd of teenagers in front of the Mills' home in Visitacion Valley and slammed him to the pavement for no reason. The youth suffered cuts and bruises, she said.

The Office of Citizen Complaints sustained two complaints of unauthorized action against Bronfeld in connection with Mills' allegations, records show.

On July 8, 1997, Bronfeld reported the first in a string of cases that would earn him his first appearance on the department's use-of-force watch list.

That day, Bronfeld reported, a "near riot" occurred when he and a partner, Officer Bud Massey, struggled to arrest a man trying to flee after a traffic stop in the Sunnydale neighborhood.

An angry crowd gathered, he said, and he had to use pepper spray on two people to help gain control of the situation. Massey told The Chronicle that he thought Bronfeld's conduct on that "extremely ugly day -- when people were hitting and kicking us -- was bordering on heroic."

On Jan. 11, 1998, Bronfeld encountered Kenneth O'Neil, sitting in the stands at 3Com Park with his father, smoking a cigar and enjoying a beer during the NFC championship game between the 49ers and Green Bay Packers.

Bronfeld reported that O'Neil became belligerent when told to put out his cigar, swore at him, and hit him several times. Bronfeld said he punched O'Neil four times in the face to subdue him, took him from the stands, and arrested him for battery on a police officer and resisting arrest.

"He just started swinging at me," Bronfeld said in a recent interview. "I was just amazed that a guy would just start swinging like that."

O'Neil, a utility lineman, said in an interview that his cigar was already out when Bronfeld "just pounded me on the back of the head." He said he defended himself and added that his 70-year-old father, who threw a beer on Bronfeld, got "a big black eye" from Bronfeld.

O'Neil said the charges against him were dismissed after a fan sitting behind him complained to San

Francisco authorities about Bronfeld's conduct. The Office of Citizen Complaints upheld two complaints of unnecessary force against Bronfeld for hitting O'Neil and his father.

The department would not comment on the record of Bronfeld or any other individual officer, citing state privacy laws.

Altercation with judge's son

In the summer of 1998, Patrick Noel, a 30-year-old consultant, said Bronfeld falsely accused him of urinating in public in front of the Great American Music Hall on O'Farrell Street and slammed his badge on Noel's forehead when asked for his badge number.

Noel filed a complaint against Bronfeld that was still pending eight months later, the night of the Polly Esther's incident. Noel said he knew Bronfeld had a tough job dealing with criminals, but he added that he was amazed by the officer's conduct toward him -- "a 30-year-old, normal, white guy."

Early the next year, Adam Moore, a 32-year-old freelance photographer, said Bronfeld hassled him in a threatening manner, incorrectly insisting he needed permission from two women before he could shoot a picture of them sitting on a curb.

The Jan. 3, 1999, incident bothered Moore enough that he filed a citizen's complaint, he said in an interview.

Bronfeld "came on like a ton of bricks," he said. "I knew there was something terribly wrong with him in terms of his policing."

Moore's complaint, too, was pending when the Duthies met Bronfeld outside Polly Esther's.

By then, Bronfeld was resorting to force with increasing frequency and radiating an intensity that frightened people who encountered him.

In March 1999, George Mann, 29, a carpenter and music producer, said Bronfeld was among several officers who falsely accused him of being drunk as he left a Tenderloin club. The police report said Mann kicked Bronfeld in the stomach and Bronfeld then struck Mann in the nose with his fist.

Mann, whose account was supported by two friends who were with him, told The Chronicle that when he demanded to know why he was being arrested, two officers each held one of his arms while a third officer hit him on the mouth.

Mann said he didn't hit back because "I would have been shot or dead if I did that." He added that charges against him were later dropped.

Mann, who had to have stitches to fix a cut on his mouth, said the Office of Citizen Complaints rejected his complaint, although he warned the agency, "You've got to get that officer off the street. He's going to kill someone."

Disabled man's struggle

On Saturday, May 29, Bronfeld responded to the corner of Polk and Geary streets, where a crowd was

yelling at officers as they tried to arrest a suspect.

According to another officer's report, Ralph Hodge, 32, a day laborer, was blocking officers trying to make the arrest. He struggled when officers tried to arrest him, the officer wrote, so he "was hit on the face by Bronfeld with an open hand."

Hodge said in an interview that he wasn't blocking anyone when an officer wearing gloves walked up and hit him in the face without saying a word.

Hodge said he was jailed briefly but never charged. He said he complained to the Office of Citizen Complaints but never heard back. Records indicate his complaint was not sustained.

Shortly after Bronfeld hit Hodge, he approached two other men in the crowd.

One, Rodney Davis, was a caseworker for the Episcopalian community shelter on that street corner. He was standing next to one of the center's clients, a man who was partially paralyzed.

From the moment Davis saw Bronfeld, Davis said in an interview, he knew he was looking at "a steamship out of control."

"I swear to God I am not a fearful guy, but the look in this guy's eyes was crazed when he jumped out of the car," he said.

"The handicapped guy was limping back, trying to get up on the curb," Davis said. "I told the officer I was a center employee trying to get the clients back into the shelter.

"The officer took his club and shoved the handicapped guy across his chest. The guy went flying back, and it was so pitiful because he didn't function on his right side to catch himself, so he goes to the ground.

"The officer had done that to a guy with half a body, so I said to the officer, 'Wow, why did you do that? The guy is handicapped.'

"The officer then does the same thing to me: He hit me across the chest with the club, and I flew back from the curb and hit the wall of the shelter."

Davis helped his client up, and when he "saw the officer's badge number on his chest, I ran into the center and wrote it down."

Davis filed a complaint with the Office of Citizen Complaints.

"I told them, 'This guy you have here is a time bomb,'" Davis recalled. "I said, 'If you guys aren't careful, this guy is going to kill somebody.'"

Chaos at dance club

In the early morning of May 30, 1999, Jesse **Serna** was in a patrol car in the Tenderloin. Marcus Bronfeld, only hours after his confrontations at Polk and Geary, was on duty in uniform, working an overtime shift as a guard at Polly Esther's dance club.

The Duthies and their friends had stopped at Polly Esther's, just north of Market Street, after an evening at Cobb's Comedy Club in North Beach. The dance floor was hot, sweaty and crowded, and the music had a loud, pulsating beat. The bar was closed, but the after-hours dancing continued.

Just next to the dance floor, Brooke Duthie saw a big, ice-filled tub that had served as a temporary beer bar earlier in the night. He grabbed a piece of ice and stuck it in his mouth, setting off a chain of violence.

Bouncers accused Brooke of trying to steal beer from the tub, though it actually held no beer at the time, and hustled him and his friend, Chris Garrity, toward the club's exit, Alison Duthie said. Then, without warning, Garrity, a 27-year-old warehouse truck driver, said someone hit him in the back of the head; outside the club, two bouncers began beating and kicking him.

Scott Morgan, a club patron who witnessed the entire incident and later testified about it in a deposition, said the bouncers probably punched Garrity 40 times and kicked him 30 times.

Standing on the sidewalk watching in disbelief, Brooke Duthie recalled later that he was happy and excited when he saw police officers arriving, thinking, "This is great -- this is over and done with."

Then an officer -- identified by others as Bronfeld -- ran up and hit Garrity with his baton 10 or 15 times.

The officer "was pulling his stick over his head and ... hitting him, boom, on the legs and, boom, on the arm," Morgan said. A crowd gathered.

All three Duthies tried to intervene, only to be hit by Bronfeld.

Again and again, Bronfeld's baton found its mark, witnesses said. Garrity was hit repeatedly as he lay on the ground. Josh was hit several times as he tried to get the bouncers to stop beating Garrity. So was Brooke as he tried to stop Bronfeld from beating 20-year-old Josh. All three men got "cuts, scrapes and deep bruises from the baton," according to Brooke Duthie.

Morgan testified that Alison attracted Bronfeld's attention when she demanded: "What are you doing to my brother?"

He said Bronfeld gave Alison a shove with his baton with such force that "her body was in the air" before she fell to the ground crying and screaming. He then clubbed her five to seven times as she lay on the pavement, Morgan said.

In his report, Bronfeld described using his baton only on Brooke and Josh, stating that they were interferring with the bouncers as they struggled with Garrity on the ground.

Alison said she was crying frantically. She said an officer "grabbed my arm and pushed it up. He was threatening me to shut up, he was going to throw me in jail, I needed to stop crying." Alison did not identify the officer, but in **Serna**'s deposition he stated that Alison grabbed his arm so he "grabbed her by the arm" and warned her she would go to jail if she continued interfering with police.

"He was twisting her arm," recalled Nanishka Camberos, Brooke's girlfriend at the time and now his

Page 7 of 9      Exhibit A to JACKSON Complaint S.F. Chronicle Feb 13, 2006

wife. "He was screaming at her, and she was just crying ... 'My back! My back! I'm hurt. Be careful.' And he wouldn't let her go."

Alison recalled, "I was screaming for help, and then I realized, 'My God! I am screaming for the people who are beating my brothers up!' "

While Garrity was handcuffed and on his knees, he later stated in his deposition, Bronfeld hit him twice on the cheek. Brooke Duthie also stated in his deposition that Bronfeld punched him in the face after he was handcuffed.

Thinking back on how he tried to pull Bronfeld off Josh, Brooke Duthie said: "I understood that was against the law, but afterwards never once did I lie about what I did, and I'd do it again.

"From my angle, I thought he was hitting my brother in the head, trying to kill him. Later, it turned out he'd been hitting him on his body, but I was afraid Josh was going to die."

Traumatic memories linger

In the end, San Francisco taxpayers would pay the Duthie family, Garrity and their lawyers $175,000 to settle their lawsuit. Part of what gave the suit power, Duthie attorney Matt Kumin said, was that "Alison was what we call 'an eggshell plaintiff' -- she arrived at the incident with her pre-existing back condition."

Sean Connolly, a deputy city attorney who handled the case, pointed to another factor affecting the March 2003 settlement. "Most plaintiffs who sue the cops come out of a world that usually deals with cops," Connolly said. "These were good-looking, middle-class folk, articulate. Two of them were models.

"You always have to assess the credibility of the witnesses and how a jury will see their testimony," Connolly said. "This was not a run-of-the-mill case."

When told the city had settled the Duthie lawsuit, Bronfeld said: "I don't understand why they would do that. I remember being kicked in the back by one of the brothers. I was heavily outnumbered, 2 to 1, or 3 to 1. They were fighting me."

Alison Duthie said that, after the incident, she spent about a month in a rehabilitation center, then "was released in a wheelchair and was in the chair for months." Today she operates two small businesses in another city.

Josh Duthie said he doesn't feel comfortable in big crowds anymore. He knows police have a hard job, he said, but he also knows things can go terribly wrong when they show up.

Brooke Duthie said he has completely rethought his view of police.

"Being a white man who doesn't live in the inner city," he said, "you hear stories of injustice done to minorities and about people picked on by police, but I never understood it until after that night."

Chris Garrity, who now works in sales, said that anytime he reads in the newspaper about San Francisco officers using excessive force, he thinks, "Yup, they're still doing it, still getting away with

it."

In July 1999, the Office of Citizen Complaints upheld Patrick Noel's 1998 complaint against Bronfeld for his actions outside the Great American Music Hall, sustaining charges of unnecessary force, unauthorized action, neglect of duty, and conduct reflecting discredit on the department.

In December 1999, the agency sustained two complaints of conduct reflecting discredit on the department against Bronfeld for threatening Adam Moore, the photographer, and misusing his police authority.

On May 19, 2000, Bronfeld resigned from the department. In a deposition for the Duthies' lawsuit two years later, he said he resigned for personal reasons.

When asked by Kumin, the Duthies' attorney, if he remembered any supervisor ever expressing concern about his use of force in any situation, Bronfeld replied: "Not that I recall, no."

On May 31, 2000, the Office of Citizen Complaints sustained one charge of unnecessary force against Bronfeld for the Duthie case, three more unnecessary force charges, one discourtesy charge, and one for conduct reflecting discredit on the department in connection with the incident involving Rodney Davis hours earlier.

In an interview, Bronfeld was dismissive of the sustained complaints in his record.

Bronfeld denied that he had used force unnecessarily. "I never hit anybody who was handcuffed," he said. "I never had any people with head injuries."

"If you were to go and talk to some of the hard-core criminals I have arrested," he said, "they would tell you that I always treated them with the utmost of respect. ... All of this looks bad, but if you talk to the other 200 to 300 people I arrested, they would say I was always straight up with them."

In 2004, the Martinez Police Department hired Bronfeld as an unpaid, gun-carrying reserve officer cleared to work under a regular officer's supervision.

**Serna**, still on the San Francisco force, went on to become the department's highest reported user of force for the nine years examined by The Chronicle.

In 2001, **Serna** received a five-day suspension for unnecessary force, neglect of duty and discourtesy for the 1999 incident with Darryl Brown in the Tenderloin.

In 2001, **Serna** reported six additional uses of forces. In 2002, he reported another six, in 2003, eight, and in 2004, four. By the end of 2004, he had reported injuring 31 people since 1996.

There is no public record indicating that **Serna** received any discipline, counseling or retraining as a result of his conduct in the Duthie case.

Today, **Serna** works out of Central Station in North Beach.

E-mail the writers at bwallace@sfchronicle.com, ssward@sfchronicle.com and efernandez@sfchronicle.com.

San Francisco Chronicle

## SAN FRANCISCO
**Bonds' trainer, student sue city, alleging police assaults**
Henry K. Lee, Chronicle Staff Writer
**Wednesday, May 16, 2007**

A college student and a personal trainer for Barry Bonds are suing San Francisco police in separate federal civil rights lawsuits, accusing officers of assaulting them for no reason when they tried to help them.

Guitarist Daniel Alvarenga, 30, said his hopes of attending the San Francisco Conservatory of Music were dashed when an officer broke his arm and arrested him after he offered to translate for a Spanish-speaking suspect in the Mission District.

Bonds' trainer, Greg Oliver, 36, said he was attacked by an officer after telling him that police were chasing the victim, not the suspect, of an assault he witnessed in North Beach.
"Society, I think, has the right to expect police officers to exercise some type of restraint or just make a better decision as it relates to ferreting out who is a potential threat or who could be Good Samaritans," Alvarenga's attorney, Adanté Pointer, said Tuesday.
Matt Dorsey, spokesman for City Attorney Dennis Herrera, declined to comment Tuesday, saying the city had not yet been served with the lawsuits, which were filed last week in U.S. District Court in San Francisco.

Alvarenga, a City College of San Francisco student, said he was walking home May 12, 2005, after playing the guitar at Radio Havana when he came across three officers arresting a Spanish-speaking man at 17th and Valencia streets.
Alvarenga said he overheard the suspect saying in Spanish, "Why are you arresting me? I did nothing wrong," the suit said. When the officers didn't respond, Alvarenga assumed they didn't speak Spanish and asked the suspect if he knew why he was being arrested, the suit said.
After the suspect told Alvarenga that he didn't know why he was being arrested, Officer Mark McKinney told Alvarenga that the police had an interpreter and that Alvarenga had better leave or he was going to be arrested for "interfering with a police investigation," the suit said.
Alvarenga replied that he didn't think he could be arrested for "merely trying to translate" and began to leave the scene. McKinney, now 32, then grabbed Alvarenga's wrist and suddenly jerked upward, breaking his humerus, and thwarting his plans to attend the conservatory and promote his new CD, said the suit, which seeks $300,000 in damages.

Oliver said in his suit that he saw three men attack another man on Broadway in North Beach on Aug. 20. Oliver said he saw the victim "on the receiving end of force" of an arriving officer and was then surprised when another officer, **Jesse Serna**, 41, pushed Oliver in the chest with a baton, the suit said.
Oliver said he told **Serna** that other officers were wrestling with the victim and not the suspect. But **Serna** struck him again with a baton, this time in the upper thigh, and officers threw him on the ground, said the suit, which seeks $1 million in damages.
Both Alvarenga and Oliver were arrested on suspicion of obstructing police, but no charges were filed, their suits said.
Police should always try to "keep their cool," said Ben Nisenbaum, Oliver's attorney. "When you lose your cool, bad things happen to good people."
*E-mail Henry K. Lee at hlee@sfchronicle.com.*

# San Francisco Chronicle

## Pin-up model sues SF police officers
## Ex-aide to Mayor Willie Brown alleges sexually derogative slur

Susan Sward, Chronicle Staff Writer
**Wednesday, May 23, 2007**



**(05-23) 12:59 PDT** -- An Oakland attorney announced today that he has filed a civil rights lawsuit seeking $1 million in damages against two San Francisco police officers who he said attacked and verbally demeaned his client.

Attorney John Burris said the incident involving his client, pin-up model Esther Hwang, occurred May 12 in front of Dolce nightclub in North Beach. In the 1990s, Hwang served as a personal scheduling secretary to Mayor Willie Brown.

Burris said the officers' unprovoked attack occurred when Hwang began a casual conversation with them after leaving the club with her boyfriend. She had been there to celebrate the completion of her exams at San Francisco Law School.

At a news conference, Hwang said that after she joked with officers about what they might do to her if she tried to cross the street, **Officer Jesse Serna** reacted by grabbing her and yanking her by her hair to the ground. She added that at that point he swore at her, using a sexually derogatory word that appalled her and made her feel powerless.

Burris added that the police report claimed that Hwang was belligerently drunk. But he said Hwang will present strong evidence that this allegation is false and that she only consumed one drink -- a pear cider -- that night.

Hwang is due in San Francisco Superior Court next month to face charges of resisting arrest and battery on a police officer. Burris pointed out that police did not cite her for being drunk in public as they reported.

*E-mail Susan Sward at ssward@sfchronicle.com.*

# San Francisco Chronicle

# OFFICER LINKED TO VIOLENT INCIDENTS
## Complaints allege undue force in 4 cases in S.F. in 9 months
Susan Sward, Chronicle Staff Writer
**Thursday, May 24, 2007**

A San Francisco police officer who reported using force more often than any other officer in the department during a recent nine-year period is at the center of four incidents in the last nine months in which citizens say they were subjected to excessive force.

In one incident, a young man who told Officer **Jesse Serna** he would be making a complaint against him said that moments later he was thrown to the ground by officers in North Beach and was zapped 12 times with a stun gun as he lay handcuffed on the street.

In another North Beach incident, a man said **Serna** hit him twice with his baton after he told police they were using force on someone who had been the victim of an assault.
In a third case, on the Embarcadero, witnesses said **Serna** and a partner wrestled to the ground a man who had called out that he would be a witness for another man whom **Serna** had hit while he was arresting him. **Serna** said in his police report that he went on to pepper-spray the would-be witness' wife and another woman.

In these cases, citizens said **Serna** had exhibited racial prejudice.

In a fourth case, a woman alleged that **Serna** used a sexual slur against her after she had joked with him and other officers about fearing what they would do to her if she tried to cross the street.

Two of these cases have resulted in lawsuits, and a third has raised the possibility of one. Since he joined the department, **Serna** has been involved in three lawsuits alleging excessive force that cost taxpayers a total of $195,000.

Sixteen months ago, The Chronicle published a series of articles on the San Francisco Police Department's use of force. For that series, the newspaper created a database of officers' 1996-2004 force reports and identified **Serna** as by far the highest reported user of force in the 2,200-member department.

In that period, **Serna** reported using force 57 times and injuring 31 people. His tally of force-involved incidents was 50 percent higher than any other officer.

Nine times in that same period, **Serna** made the watch list the department maintains to identify frequent users of force, according to documents provided by the department.

Since the use-of-force articles were published, The Chronicle has requested copies of the department's watch lists for the years 2005 and 2006. The department declined to provide the watch lists, maintaining that they were personnel records protected from public inspection by state law. The latest incidents place renewed focus on **Serna**, who joined the force in 1995 and is assigned to

Central Station.

He is the stepson of one of the department's highest-ranking officers -- Police Commander Stephen Tacchini. Tacchini, who supervises the city's 10 district stations, including Central, did not return The Chronicle's calls.

Police Chief Heather Fong said a commander in Tacchini's position would not be involved in investigations of officers at the district station level.

Fong said privacy provisions in state law bar her from commenting on personnel matters involving any officer.

She said she did not learn about "the matter of these four cases" until a call from The Chronicle on Tuesday afternoon requesting comment.

She added: "I have directed the captain of the station to review these cases and make a recommendation regarding what he believes would be appropriate action."

Efforts to reach **Serna**, 41, for comment were unsuccessful. The department said he was on vacation.

Steve Johnson, business agent for the San Francisco Police Officers Association, said, "I personally know **Serna**. I worked with him at Mission Station, and he's an outstanding officer." What follows is a detailed account of the incidents involving **Serna** based on interviews, court filings and other documents:

Greg Oliver

At 1:45 a.m. in North Beach on Aug. 20, 2006, Barry Bonds' personal trainer, Greg Oliver, left the Impala Club at the corner of Broadway and Kearny, where he had been with several friends.

As he walked along Broadway looking for a taxi, he saw three men attack another man. Police quickly responded, and Oliver said that he tried to tell the officers that they were using force on the man who had been the victim of the assault.

When an officer who he later learned was **Serna** ordered him to back up, Oliver said he complied. But then, he said, **Serna** hit him twice with his baton. When he then asked for **Serna**'s badge number, he said, **Serna** grabbed Oliver by the neck and shirt, breaking the necklace he was wearing and telling him he was under arrest.

At that point, Oliver said he yelled out he was not resisting but was thrown to the ground by several other unknown officers who began punching him and kneeing him in the back. When **Serna** pulled Oliver up from the ground, Oliver said, **Serna** wrenched his left wrist so hard that he screamed. In response, Oliver said **Serna** told him to "shut the f -- up" and continued wrenching his wrist.

According to a lawsuit filed in federal court later by his attorney, John Burris, Oliver was arrested on "fabricated charges that he resisted, obstructed or delayed a peace officer in performance of their

duties," but no charges were ever filed against him.

Alleging that Oliver's civil rights were violated, the lawsuit seeks $1 million in damages. The suit also notes that Oliver is "readily recognizable as African American" and says that **Serna** and the other officers were "motivated by racial prejudice."

Burris said that the fact that **Serna** still works the streets reflects "an attitude that the department undoubtedly has where it would rather have this tough, abusive guy on the force than control him. It sends the totally wrong message to officers who don't engage in this kind of conduct."

Mehrdad Alemozaffar

At about 2 a.m. Dec. 17, 2006, Mehrdad Alemozaffar, a 26-year-old UCLA medical student visiting the city, was waiting on the street for a friend to buy some pizza from a shop on Broadway that was about to close.

Just then, Alemozaffar said, three police officers came along, yelling for everyone to get off the street. Alemozaffar said he and two young women who were walking next to him were pushed in the back by the police.

"They were pushing us for no reason -- I said, 'Stop pushing us, we're walking' and they were like, 'walk faster,' " Alemozaffar recalled in an interview. He said he ended up standing behind a metal police street barrier near Broadway and Montgomery and told the officers, "I am just waiting for a friend. She's my ride."

At that point, he said one of the officers -- he later learned it was **Serna** -- said to him: "Stop acting like such a girl." Alemozaffar, who is of Persian descent, said he was "taken aback -- I am in San Francisco, a liberal town. I said to him: 'What? Why would you call me that? I am obviously not a girl. Are you discriminating against me or what?' "

"He said in reply, 'I am calling you a girl because you are acting like one,' and he laughed. I will never forget that laugh -- it was like, 'I have more power than you and can say whatever I want.' " Alemozaffar said he looked at **Serna**'s badge and said, "OK, Officer **Serna**, I will make sure I take this up with the right people."

He said that as he and the young women began to walk away, he was grabbed from behind by officers -- he never knew how many -- and was dropped to the ground. He said, "I didn't put up a fight" as police put his hands in plastic handcuffs and smashed his face "repeatedly into the ground."

"I am screaming 'Stop, I am not fighting you,' and the next thing I feel is this jolt up and down my body. I was already face down on the ground and in handcuffs before I was tasered. I passed out a couple of times. I remember one jolt that lifted me off the ground and my entire back was arching -- it was unbelievable pain."

A sheriff's deputy, J. Reymunudo, was using a stun gun, the department said. His report, supported by a partner's, says he was assisting **Serna** and other police officers who were having trouble taking Alemozaffar into custody and that he used the device twice on Alemozaffar until he was subdued. The Chronicle obtained photographs of Alemozaffar taken after the incident. They show many burn marks that he said were made by the stun gun.

Sheriff Michael Hennessey, asked about Alemozaffar's assertion he was hit by a stun gun 12 times while handcuffed, said: "I can assure you no deputy sheriff would use a stun gun on a handcuffed prisoner, or they would be fired, and I think all my deputies know that."

Alemozaffar said police cited him for resisting arrest and battery on a police officer.
Since then, he said, he has found three people who witnessed what happened to him. One gave him a murky video of the incident taken with a camera phone, which was reviewed by The Chronicle. The voices of people watching the incident can be heard.

"Kneed him and tasered him," a voice says. "They are still going at him!" one says. "They are still tasering the s -- out of him!" and "He didn't even swing on him, dude" and "No, he didn't do nothing."

Alemozaffar, who says he will begin a medical residency at Harvard University in the fall, blames what happened to him on "wrong place, wrong time, wrong color."
"I look brown," he said. "Deep in my heart I think what happened is you have a bad cop who thinks he can get away with doing and saying whatever he wants, and he thought I was some punk kid. This guy does not belong in a position of power."
Since Alemozaffar's encounter with **Serna**, he has hired two lawyers. The lawyer in his criminal case, John Runfola, said the district attorney decided there was not enough evidence to file charges against his client. Alemozaffar's other lawyer, Sanford Cipinko, said he will file a claim against the officers and deputy involved as well as the police and sheriff's departments, and he plans to file a lawsuit if a settlement is not reached.

Alemozaffar said he wants to see "**Serna** off the street. I feared for my life that night. I felt like I was going to die after being tasered repeatedly. I had a right to ask for his badge, but **Serna** has a personal agenda of taking the law into his own hands. He escalated a nonviolent situation into a potentially life-threatening one."
Shawn and Sarah Myers
Late in the afternoon of Feb. 24, 2007, at a spot near the Ferry Building on the Embarcadero, **Serna** and a partner were arresting a man who had been involved in a fight with a motorist.
In his police report, **Serna** said he got a handcuff onto the left hand of Jamal Jackson, 18, of San Francisco, but the suspect pulled his right hand away.
"Fearing that he may have been reaching for a weapon, I struck Jackson with my right fist on his lower back because I had no other force option available to me to detain the suspect," **Serna** wrote. Jackson then called out, asking if anyone had seen what **Serna** did. Shawn Myers, 34, an African American San Francisco resident who was waiting with his wife for his car at a nearby parking lot, responded that he had seen what happened.
Myers' wife, Sarah, 32, wrote in a statement that day that **Serna** immediately came over and told her husband to put his hands behind his back. As her husband was being forced to the ground, Sarah Myers said, "I stood there asking why were they doing this," and at that point "I was pepper-sprayed in the face by Officer **Serna**."
In his report, **Serna** contended that Shawn Myers had approached him in an aggressive posture with his hands in his jacket pocket, telling **Serna**, "F -- you, shoot me, mother -- ."
**Serna** reported he had to pepper spray Sarah Myers after she had "run towards us with her arms out as if she were going to push us or possibly attempt to free Myers." He said he had to pepper-spray

another woman who also rushed at him.

Jackson, the man who **Serna** was trying to arrest, wrote a statement later identifying the second woman as his girlfriend.

Jackson said that after his girlfriend was pepper-sprayed, he fled the scene to avoid being pepper-sprayed himself. He said he was caught and placed in the back seat of a patrol car. He added that **Serna** jumped in the back seat with him and "started hittin' me on my side back of my head because I had my head down; he pulled my head up and hit me again, callin' me 'n -- .' "

Five witnesses wrote statements, included in the police report, that were critical of the police conduct in the incident.

Myers' San Rafael lawyer, Matt Mani, denied that Myers had sworn at **Serna**. "All my client did was see an injustice and offer to be a witness," Mani said.

He added that after Myers was cuffed and in a police van, **Serna** repeatedly used racially charged language to disparage both Myers and his wife.

Reflecting on the encounter with **Serna**, Sarah Myers told The Chronicle, "Prior to this incident, I've never had a negative encounter with the police. I have a number of friends who are officers, and I have a great deal of respect for them."

Myers, who faces an Aug. 1 court hearing on charges of interfering with an officer, battery on an officer and resisting arrest, said that **Serna** at one point called him "boy" and after placing him in a police van, called him "monkey" and said "monkeys belong in cages." Myers also quoted **Serna** as saying: "That sure is an ugly white bitch you're married to."

Esther Hwang

On May 12, 2007, at about 10:30 p.m., Esther Hwang -- a pin-up model and a former personal scheduler for Mayor Willie Brown -- was waiting for her boyfriend outside the Dolce club in North Beach when she saw some officers nearby.

Hwang, who said she had been celebrating after finishing exams at San Francisco Law School, said that, as a joke, she called out flirtatiously, "I guess you'll have to tackle me if I were to try to cross the street."

Suddenly, she said, one officer -- who she later learned was **Serna** -- twisted her arm behind her back while another grabbed her from behind. She said **Serna** yanked her to the ground by her hair and said to her, "You f -- c -- ."

Those words, she told a crowded news conference Wednesday, made her "feel small and powerless."

Put into a police wagon, she was driven to Central Station where she said she passed out due to an anxiety attack, hurting her head in the process. Later she was cited for battery on an officer and resisting arrest and was released.

Her lawyer, John Burris, told reporters that he had filed a federal civil rights lawsuit against **Serna** and the department seeking $1 million in damages.

Burris said the police reports say she was "belligerently drunk," but he said Hwang had only consumed one drink.

Hwang is due in Superior Court late next month to face charges of resisting arrest and battery on a police officer. "What got to me the most," Hwang said, "is Officer **Serna** does this to people on a random basis, and no one does anything about it."

*E-mail Susan Sward at ssward@sfchronicle.com.*

# San Francisco Chronicle

**SAN FRANCISCO**
## Witnesses back man's story of stun gun zapping
Susan Sward, Chronicle Staff Writer
**Friday, May 25, 2007**



A medical student's account of being thrown to the ground by officers in North Beach and zapped repeatedly with a stun gun was bolstered Thursday by two witnesses who said they watched as the man writhed and cried out when the electric charges hit him.

The witnesses' comments followed an article in The Chronicle that described the zapping incident Dec. 17 and three other cases in which citizens allege that **Officer Jesse Serna**, 41, used **excessive force** and in some instances **made racially charged remarks denigrating them.**

The man being zapped "was saying 'I'm down, I'm down' as they Tasered him," said Elisabeth Chaplin, 26, one of the witnesses who gave her account Thursday.
In response to the newspaper's account of the zapping incident and the other cases involving **Serna, Police Chief Heather Fong** has said she has directed an internal investigation into the cases.

Chaplin, a graduate of UC Santa Barbara who was visiting that night from her home in Southern California, said she and four friends had never met the man before they found themselves walking next to him on Broadway.

"He wasn't doing anything," she said. "There were four or five grown officers standing over him, and he's not a big guy. He was lying face down with his hands behind his back before they started Tasering him."

The description of the stun gun incident by Chaplin and one of her friends, Amy Alton, 26, reflects comments made by voices heard on a video of the incident that was recorded by a bystander and given to Mehrdad Alemozaffar, 26, the man zapped by the device. The voices comment on how Alemozaffar's zapping lasted a long time.

Alton, an East Bay resident who knew Chaplin at UC Santa Barbara, said: "I was crying as I watched. We were outraged. We could see him writhing. He had been a little antagonistic verbally toward the officers, but never in any physical sense at all. After he shouted 'I'm down, stop!' they Tasered him again."

Responding to The Chronicle's account of cases involving **Serna**, several police commissioners said the incidents underscore the need for rapid adoption of an early

intervention system, which the department says it wants running by the end of the year. In the meantime, the department has said it has a backup system to alert it to problem officers whose performance indicates they may need intervention.

The need for an intervention system has been stressed since 2003 when both a city controller's report and the American Civil Liberties Union called for a computerized system to track officers' performance to catch problem behavior early on.

Sixteen months ago, in articles on the police department's use of force, The Chronicle identified **Serna** as having reported using force far more often than any other officer in the department.

In the 1996-2004 period studied by the newspaper, **Serna** reported using force 57 times and injuring 31 people. Nine times in that period, **Serna**'s name appeared on the department's own watch list identifying its most frequent users of force.

In the stun gun incident, Alemozaffar, a UCLA medical student who was visiting the city, said his problems began as he was waiting for a ride, when **Serna** and other officers arrived to clear the street about 2 a.m.

Alemozaffar, who says he will begin a medical residency at Harvard University in the fall, said he was dropped to the ground by officers after he told **Serna** he was going to make a complaint about him after **Serna** taunted him, telling him he was acting like a girl.

Alemozaffar said after he was handcuffed and lying face down on the street, he was hit by the stun gun 12 times. The sheriff's deputy using the device that night, J. Reymundo, said in his report that he fired twice to help officers subdue Alemozaffar.

Asked about Alemozaffar's assertion he was hit a dozen times, Sheriff Mike Hennessey said Wednesday: "I can assure you no sheriff's deputy would use a stun gun on a handcuffed prisoner or they would be fired."

The accounts of the two witnesses differed from the deputy's version.

Chaplin said: "The Tasering was repeated -- it was more than two. I could definitely believe it was 12." Alton estimated that Alemozaffar might have been zapped six to eight times.

On Thursday Hennessey's spokeswoman, Eileen Hirst, said no one has complained to the office about the stun gun incident. But she added: "If these witnesses would like to contact us, we would be very interested in talking to them about what they saw that night."

**Neither Mayor Gavin Newsom** nor Theresa Sparks, the new president of the Police Commission, returned The Chronicle's calls for comment on its account of **Serna**'s four recent cases.

But four police commissioners -- Joe Veronese, Yvonne Lee, Petra DeJesus and David Campos -- all said they hope that the new early intervention system tracking officer conduct will assure that problem officer conduct is spotted and acted on quickly.

In the wake of the zapping, both Chaplin and Alton say they were left shaken.

Alton said she feels badly because she has friends who are officers and she doesn't want this incident "to taint my view of all officers in general. I felt sad and disappointed that these officers who were supposed to protect us engaged in behavior that was totally out of line."

*E-mail Susan Sward at ssward@sfchronicle.com.*

# San Francisco Chronicle

**SAN FRANCISCO**
**Police official to order probe in zapping case**
Lance Williams, Chronicle Staff Writer
**Saturday, May 26, 2007**

The new president of the San Francisco Police Commission says she wants an immediate investigation into allegations that a veteran police officer used excessive force on citizens in four separate incidents in the past nine months.

In an interview Friday, Commission President Theresa Sparks said she would direct the Office of Citizens Complaints to probe the allegations of misconduct on the part of Officer **Jesse Serna**, which first were detailed this week in two stories in The Chronicle.

"I think we need to get an investigation started immediately," she said. "I know the department is instituting an investigation, but the OCC should institute one as well.

"It's my intent to direct them to do so."

The Office of Citizen Complaints investigates accusations against police officers and forwards its findings to the police chief and the commission for action. Chief Heather Fong has said she ordered an internal probe of the allegations about **Serna**.

**Serna**, 41, is a veteran officer who reported using force while making arrests 57 times during a recent nine-year period -- more often than any other San Francisco officer. The city has paid out $195,000 to settle three lawsuits in which **Serna** was a defendant, the stories said.

According to The Chronicle stories, in the past nine months **Serna** was involved in four arrests in which citizens complained he abused them.

In one case, a medical student said **Serna**, sheriff's Deputy J. Reymunudo and other officers shoved his face into the pavement and zapped him with a stun gun while arresting him for resisting arrest in North Beach.

In another North Beach incident, Greg Oliver, a trainer for Giants outfielder Barry Bonds, said **Serna** hit him with a baton when he tried to tell the officer he was arresting the wrong man in an assault.

In yet another North Beach incident, Esther Hwang, a model and former secretary to Mayor Willie Brown, said **Serna** grabbed her, cursed her and shoved her to the ground after she called out to the officer outside a nightclub.

In an incident near the Ferry Building, Shawn Myers said he was arrested by **Serna** and that his wife, Sarah, was pepper sprayed, after they watched **Serna** punch a suspect while making an arrest.

**Serna** has not been available for comment. In police reports, he said he had used an appropriate amount of force to make arrests.

Of the allegations about **Serna**, Sparks said, "If it's true, that's really egregious behavior and we need to address it." She said she was particularly concerned about the incident involving the stun gun. Although sheriff's deputies are permitted to use Tasers, which can be converted into a stun gun mode that delivers a less powerful jolt, San Francisco police officers have not been given the authority to use either device.

"The Tasering, I don't know how that happens," she said. "We don't officially have Tasers in the department. We haven't authorized the department to use Tasers and I would be very concerned if officers are carrying their own. So there are a lot of different elements of this story that we need to get to the bottom of."

She said she would order the probe at a commission meeting next week.

Mayor Newsom has not responded to requests for comment on the allegations about **Serna**.

*E-mail Lance Williams at lwilliams@sfchronicle.com.*

Page 1 of 1          EXH. A; S. F. Chronicle, May 26, 2007

# San Francisco Chronicle
## Editorial
## Behind the shield
Tuesday, May 29, 2007

POLICE AGENCIES across the state are hiding behind the shield of a 2006 state Supreme Court ruling that declared officers' disciplinary records were off limits to the public.

Last week's stories about **San Francisco Officer Jesse Serna**, subject of accusations of excessive force in four cases even after a Chronicle analysis found that he had used force more than any other officer, underscores why the public should have a right to see how and why a police department is managing its ranks.

But the ability of the public to view police misconduct records has been severely constrained by the Aug. 29, 2006, state Supreme Court ruling (Copley Press vs. San Diego) that disciplinary records were "private" personnel matters.

The absurd notion that a police officer's conduct is a "private" issue will probably come as a surprise to those who have felt or even witnessed the brunt of a renegade officer's wrath -- or, far more often, seen an officer's courage and professionalism under stress.

"These aren't just any public employees that have achieved the holy grail of KGB-like official secrecy -- they are the only public officials given the right by the public to affect the personal liberty of citizens and even take life, if necessary, to protect the public peace," the California Newspaper Publishers Association wrote in support of state Sen. Gloria Romero's SB1019, which would overturn the Copley decision to assure the public at least limited public access to police complaint records and hearings.

The bill by Romero, a Los Angeles Democrat, barely squeaked through the Senate Public Safety Committee on a 3-2 vote.
It now faces what is expected to be a tough fight on the Senate floor. A broader Assembly version, AB1648 by Mark Leno, D-San Francisco, has stalled in committee.

It's unfortunate that many law enforcement groups have lined up in opposition to a bill that would reassert the right of the public to see what they insist is the case: That the overwhelming majority of officers are doing their jobs with honor and restraint. If that is so -- as we believe it is -- then the many good cops should welcome a process that assures them and the public they serve that the few bad actors are being identified and disciplined.

Sunshine is not only in the public's interest, it's in the officers' interest -- both by creating a climate of openness and accountability, and providing a chance for witnesses with exculpatory information to come forward. Urge your state senator to vote for SB1019.

Contact information for senators can be found at www.senate.ca.gov.

San Francisco Chronicle

## SAN FRANCISCO
## Officer called a 'suspected' public danger
Susan Sward, Chronicle Staff Writer
**Thursday, May 31, 2007**

A San Francisco police commissioner described a North Beach officer who is the target of recent excessive force allegations as a "suspected" danger to the public Wednesday and called for his removal from street duty while the complaints are investigated.

Police Commissioner Joe Veronese's comments about Officer **Jesse Serna**, 41, came one week after The Chronicle wrote about four incidents in the past nine months in which citizens alleged that **Serna**, who works out of Central Station, used excessive force on them without any reason.

"It is incumbent upon the leadership of this department to act responsibly by removing any officer from public contact who has demonstrated or is suspected of posing a danger to the public," Veronese wrote to The Chronicle in an e-mail. "Officer **Serna** is suspected of posing such a threat and should be removed from public contact until such time that this concern is resolved."

At a Police Commission meeting later in the day, Veronese reiterated his call that **Serna** be moved off street duty while the four incidents are investigated.
The commission's newly elected president, Theresa Sparks, said after the meeting that she could not comment on "individual cases because they might come in front of us and an officer has a right to privacy under current law."

Sparks also said she hopes to put before the commission next week a resolution clarifying that it has the authority under the city's Charter to direct the Office of Citizen Complaints to investigate cases in which claims or lawsuits have not been filed or in cases in which allegations have been made by people but no complaint has been filed with the OCC.

Police Chief Heather Fong, citing privacy laws, declined to say what action, if any, the department has taken regarding **Serna** since The Chronicle's story appeared. Last week she said she directed **Serna**'s captain to review the case and make a recommendation.

This is not the first time that **Serna** has found himself in the midst of controversy.
Sixteen months ago, The Chronicle published a series on the San Francisco Police Department's use of force and identified **Serna** as the officer who had reported using force far more often than any other officer in the 1996-2004 period studied. In that time period, **Serna** reported using force 57 times and injuring 31 citizens. **Serna** is the stepson of one of the department's highest ranking officers, Commander Stephen Tacchini.

The new episodes involving **Serna**, described last week by the newspaper, occurred between Aug. 20, 2006, and May 12, 2007. In all four cases citizens said **Serna** resorted to force without provocation, and in three of the cases they alleged he exhibited racial prejudice.

Two of these four cases have prompted lawsuits and a third involves the possibility of one against **Serna**, who previously had been named in three other lawsuits that cost taxpayers a total of $195,000.

Veronese also told the commission he believes it should revisit the order it approved recently establishing an early intervention system, known in the department as EIS, which will keep a computerized record of officers' conduct intended to early identify officers with problem behavior so they can be trained or counseled.

Before approving creation of the system, which the department hopes to have up and running by the end of the year, the commission agreed that none of the information stored in the system could be used for disciplinary purposes and that the disciplinary process instead will be a separate system. But Veronese told The Chronicle that if the department learns from the EIS that an officer has engaged in a pattern of dangerous conduct, "then it has an obligation to act to protect the public, including the full spectrum of disciplinary action."

Veronese also said he wanted to see the department adopt a "new aggressive" approach to investigating homicides within the city -- including the addition of personnel, more training and technology to combat the problem.

Any homicide, he said, should prompt "the same the level of response" that occurs when an officer is shot.

*E-mail Susan Sward at ssward@sfchronicle.com.*

# San Francisco Chronicle



**SAN FRANCISCO**
**Police officer noted for use of force is off of street duty**
**Department transferring him to a 'non-public-contact' post**
Susan Sward, Chronicle Staff Writer
**Thursday, June 7, 2007**

San Francisco police Officer **Jesse Serna**, who has been involved in five incidents in the last nine months in which citizens accused him of using excessive force without provocation, has been removed from street duty, the department said Wednesday.

**Serna**, a 12-year veteran who had been stationed in North Beach, has been assigned to an undisclosed "non-public-contact" position, police spokesman Sgt. Neville Gittens said. **Serna** was transferred based on a review of his record that Chief Heather Fong ordered after The Chronicle detailed four of the incidents in a story last month, Gittens said.

Fong said Wednesday night that the 41-year-old **Serna** "will be on this until further notice." He was taken off the streets last week.

A Chronicle analysis last year of police records from 1996 to 2004 identified **Serna** as the officer who had reported the most instances of use of force in the department. Two of the four recent incidents involving **Serna** have resulted in lawsuits against him and the city, and a third has led to a legal claim, which is often the precursor to a suit.

Word of **Serna**'s transfer came the same day that yet another lawsuit was filed against him. The plaintiff in the latest case is a 27-year-old Menlo Park waiter who accuses **Serna** of slamming him against a police wagon and throwing him to the ground in response to a question about his conduct.

Efforts to reach **Serna**, the stepson of one of the department's highest-ranking officers, Cmdr. Stephen Tacchini, were unsuccessful.

In the latest lawsuit, Marco Maestrini said **Serna** attacked him after Maestrini questioned why a group of officers including **Serna** was beating another man on the street in North Beach.

Maestrini is seeking $1 million in damages in his lawsuit, which was filed in federal

court by civil rights attorney John Burris of Oakland.

According to the lawsuit, Maestrini left the Dragon Bar nightclub on Broadway with friends about 1:30 a.m. Oct. 29. The suit says he was dressed in Halloween garb, "a jailbird costume and long-haired wig." It adds that he "was not intoxicated."

When Maestrini and one of his friends saw someone being beaten by several officers, the suit says, Maestrini asked them, "What's going on?"

In response, **Serna** grabbed him, slammed him twice against a police wagon, hit him and dropped him to the ground, the suit says.

When Maestrini, blood flowing from his head, asked **Serna** why he was being detained, **Serna** told him, "Oh, you're crying like a little girl," the suit says.

Maestrini incurred a hospital bill of about $4,000 for treatment of head injuries and other injuries, according to the suit. No charges were ever filed against him, the suit says.

"This is another shocking example of how this officer is out of control," Burris said. "He has demonstrated a short fuse and treats citizens who make legitimate inquiries of him as if they have no rights."

Burris filed a federal lawsuit two weeks ago on behalf of Esther Hwang, a former scheduling secretary for Mayor Willie Brown. She says **Serna** dropped her to the ground on May 12 on a North Beach street and called her a vulgar name after she jokingly asked officers what they would do if she tried to jaywalk.

In April, Burris sued on behalf of Greg Oliver, personal trainer for San Francisco Giants star Barry Bonds. Oliver says that on Aug. 20, **Serna** hit him with his baton twice after Oliver pointed out that officers were using force on a man who had actually been a victim of an assault -- not a perpetrator -- on a North Beach street.

Both suits also seek $1 million in damages.

**Serna** is also the subject of a legal claim filed against the city. UCLA medical student Mehrdad Alemozaffar, 26, says several officers set upon him Dec. 17, and that he was zapped a dozen times by a sheriff's deputy's stun gun, after he told **Serna** he was going to make a complaint about his conduct.

The deputy filed a report saying he had used the stun gun only twice, but some witnesses say the zapping went on longer than that.

Sheriff Mike Hennessey said Wednesday that data downloaded from the stun gun indicate it had been fired three times that night, and he said one of those firings probably had been a test.

Hennessey said the device's printout did not give an accurate date or time of the incident, and "that raises a question of whether we need additional information on the accuracy of the device's reporting mechanism. We are doing everything we can to resolve this."

In his claim, Alemozaffar says **Serna** made a comment similar to the one Maestrini reports in his suit. Alemozaffar says **Serna** told him "to stop acting like such a girl."

San Francisco taxpayers have paid out a total of $195,000 in three earlier lawsuits unrelated to the current cases in which plaintiffs claimed that **Serna** used excessive force against them.

*Chronicle staff writer Heather Knight contributed to this report. E-mail Susan Sward at ssward@sfchronicle.com.*

**San Francisco Chronicle**

## Medical student sues S.F. officers in stun-gun case
Henry K. Lee, Chronicle Staff Writer
**Friday, August 31, 2007**



A San Francisco police officer who has been the target of several complaints from people who say he used excessive force was among five law enforcement officers sued Thursday by a medical student, who says he was told to "stop acting like such a girl" and zapped with a stun gun during a North Beach sweep.

Mehrdad Alemozaffar, 27, who is to begin a medical residency at Harvard University this fall, said Officer **Jesse Serna** was among the police officers and sheriff's deputies who tackled him to the ground near Broadway and Montgomery Street at about 2 a.m. Dec. 17.
The incident happened after officers trying to get Alemozaffar and two friends to leave the area pushed them in the back, the federal civil-rights suit said. When Alemozaffar complained, **Serna** replied, "Stop acting like such a girl," the suit said.
When Alemozaffar asked **Serna** why he had said that, **Serna** chuckled and replied, "I am calling you a girl because you are acting like one," the suit said.
Alemozaffar was handcuffed and placed facedown on the street. Then sheriff's Deputy J. Reymundo shocked him at least 10 times with a Taser, the suit said.
The suit names **Serna** and two other police officers, along with Reymundo and another deputy.
Sheriff Mike Hennessey has said that data downloaded from the stun gun indicates it had been fired three times that night. One of those firings was probably a test, he said.
Deputy City Attorney Sean Connolly said Thursday that Alemozaffar, at the time a UCLA medical student, had disobeyed a police order to leave the area and had resisted arrest.
"It defies common sense that the police or sheriff would go out of the way to Taser someone who's not doing anything illegal or not disobeying a lawful order or not resisting arrest," Connolly said in an interview.
In court papers, Connolly wrote that Alemozaffar "voluntarily placed himself in a position of peril."
A Chronicle analysis last year of police records from 1996 to 2004 identified **Serna**, 42, as the officer who had reported the most instances of use of force in the department. **Serna** has been involved in five incidents in the past nine months in which citizens accused him of using excessive force without provocation.
In June, San Francisco Police Chief Heather Fong ordered **Serna** removed from street duty based on a review of his record that she ordered after The Chronicle detailed several incidents.
**Serna**, a 12-year veteran who had been stationed in North Beach, remains in an undisclosed "nonpublic-contact" position, Sgt. Neville Gittens, a department spokesman, said Thursday.
*E-mail Henry K. Lee at hlee@sfchronicle.com.*

Page 1 of 1        Exhibit A; S.F. Chronicle August 31, 2007

**San Francisco Chronicle**

## If you're an S.F. cop, Central Station is where it's at

John Koopman, Chronicle Staff Writer
**Monday, October 29, 2007**

It doesn't look like much from the street. The San Francisco Police Department's Central Station is old and drab with a substandard holding cell and electrical problems. The rest of the building is a parking garage, so the officers who work at Central have tons of concrete and steel and engine blocks hanging over their heads.

And it is considered the most desirable place to work in the SFPD.

"If you want to get on the day shift at Central Station, you're probably going to need 20 years in the department," said Capt. Jim Dudley, the station commander.

Some cops want action, so they seek the high-crime stations like Bayview, Ingleside or Mission. For others, it's more about community policing, walking the beat, tipping the hat and chatting up the locals, like they find at Central. "You can fight crime here, but you have to work a little harder at it," Dudley said.

There were three homicides in the district last year and two so far this year. Other stations have that many in a week.

Central Station is on Vallejo Street between Powell and Stockton, in a cluster of blocks notched between Chinatown

and North Beach. Of all the nine district stations, Central contains the most neighborhoods, tourist attractions and events that define San Francisco. It includes Fisherman's Wharf, Coit Tower, North Beach, Chinatown, the Financial District, Union Square, Nob Hill and Russian Hill.

Seven of the top 10 San Francisco tourist attractions are in the district, as well as 12,000 hotel rooms and 30,000 residents.

The view from the top parking level on the roof of the building is priceless. For 360 degrees, there is nothing but the essence of San Francisco. You can see Alcatraz, the Golden Gate Bridge, the bay, the city skyline.

The building was constructed in 1969, making it second only to the Hall of Justice at 850 Bryant St. as the oldest police station in the city.

Jim Deignan is one of the most senior officers in the department, with 36 years on the job. He's spent more than 20 at Central Station.

Deignan has been around long enough to see the neighborhood, and the city, change. He points to buildings up and down Vallejo near Columbus and recites the names of residential hotels that catered to blue-collar bachelors in the old days. Now, those places are inhabited by immigrant families, or have been turned into high-priced condos or apartments.

He remembers the old bars and restaurants where the city's power brokers once held court. Some are still around, like the Washington Square Bar & Grill. But time and gentrification have forced others to the wayside, like the Golden Spike.

Deignan says a lot of cops like working at Central Station because they feel more appreciated there. Teeming with tourists and local characters, the neighborhood is more cop-friendly than the high-crime communities of Bayview or the Western Addition.

He said most chiefs of police, including the current one, Heather Fong, worked at Central Station on their way up the ranks. The commanding officer, as well as the men and women who work



the streets, rub shoulders with the rich and powerful of San Francisco.

"This is the kind of place where you have to be personable, as well as do your job effectively," Deignan said.

Until recently, Central Station was also the place where Officer Jesse **Serna** worked. A Chronicle analysis last year of police records from 1996 to 2004 identified **Serna** as the officer who had reported the most instances of use of force in the department. Two of the four recent incidents involving **Serna** have resulted in lawsuits against him and the city, and a third has led to a legal claim, which is often the precursor to a suit. **Serna** was removed from the station this summer after a review of his record by Chief Fong.

In private conversations, officers at the station expressed mixed feelings about **Serna** and his removal to a job in which he has no contact with the public. Some said **Serna**'s actions gave the department a black eye; others said the situation was much more complex than that.

"Jesse's a throwback," said one officer. "He's a good guy with a good heart, but he's very tough and he's very aggressive."

Central is known in the department as a "misdemeanor station," but that belies some very real and very serious crime problems that have plagued the district in the last couple of years. The biggest problem has been the late-night scene outside the Broadway strip clubs, the areas around Grant and Green and Broadway and Columbus.

Young toughs, oftentimes gang members from the East Bay or elsewhere in the city, would go to North Beach late on Friday and Saturday nights. They would fight each other, or attack innocent bystanders.

"Young guys trying to make their mark would target couples walking by themselves," Dudley said. "They would make some comment about the guy's wife or girlfriend, and if the guy responded, they would jump him. If he didn't respond, they would hit him anyway."

The problem got so bad, Mayor Gavin Newsom held a news conference at Broadway and Columbus to announce a crackdown on the late-night shenanigans. The police beefed up patrols and enforced a zero-tolerance policy on anti-social behavior. Apparently, that put a damper on the violence, but it still springs up sporadically, according to the officers at the station.

Most other stations in the city are new and nice, with lots of offices. At Central, from the outside, it appears that the station occupies the entire building on Vallejo Street, but in reality, it is only a small space on the bottom floor, with men's and women's locker rooms in the basement.

The heart of the station is a large room where officers write reports and hold line up at the start of every shift. Life revolves around a large conference-room table. Newspapers and paperback books clutter the table, and the officers lunch there on salami and olives from the North Beach delis. It's a place were gossip is exchanged and rumors started.

High up on the wall is a shrine, much like the kind you'd find in a store in Chinatown. There are a couple of Chinese characters, a statue of St. Christopher, a figure of a motorcycle cop, a Pee-wee Herman doll, a troll doll and a couple of overtime cards.

An officer passing by as the shrine was being examined quipped: "That says everything you need to know about Central Station."

Reporter John Koopman and photographer Brant Ward are focusing on the San Francisco Police Department. Their stories appear weekly in the Monday paper. To see more photos, more stories and the Badge blog, go to sfgate.com/thebadge.

E-mail John Koopman at jkoopman@sfchronicle.com.

**San Francisco Chronicle**

## Couple sues S.F. officer for harsh treatment

Henry K. Lee, Chronicle Staff Writer
**Saturday, March 1, 2008**

A San Francisco couple have filed a federal civil rights lawsuit against San Francisco police, saying an officer with a history of misconduct allegations arrested the husband and pepper-sprayed the wife after they watched the officer punch a suspect during an arrest.

Shawn Myers and his wife, Sarah, said they were attacked without cause on Feb. 24, 2007, by **Officer Jesse Serna**, a police officer who has been the target of several complaints from people who say he used excessive force.

The couple's attorney, Matt Mani, said Friday, "All that Mr. Myers did was speak up when he saw something wrong occurring."

The suit, filed Wednesday in U.S. District Court in San Francisco, names the city of San Francisco, **Serna** and Police Chief Heather Fong. Alexis Thompson, a spokeswoman for City Attorney Dennis Herrera, declined to comment Friday, saying city officials had not been served with the complaint.

But a police report filed in connection with the case cast at least some of the blame on the couple, and Myers' attorney confirmed that his client is facing criminal charges.

Police said **Serna** and a partner were near the Ferry Building on the Embarcadero, arresting a man who had been involved in a fight with a motorist. In his police report, **Serna** said he got a handcuff onto the left hand of Jamal Jackson, then 18, of San Francisco, but the suspect pulled his right hand away.

**Serna** reported that he hit Jackson in the back with his fist, fearing the man may have been reaching for a weapon. Jackson then called out, asking if anyone had seen what **Serna** did. Myers, an African American man who was waiting with his wife for his car at a nearby parking lot, responded that he had seen what happened.

Myers' wife wrote in a statement that day that **Serna** immediately came over and told her husband to put his hands behind his back. As her husband was being forced to the ground, Sarah Myers said, "I stood there asking why were they doing this," and at that point "I was pepper-sprayed in the face by Officer **Serna**."

In his report, **Serna** said Myers had approached him in an aggressive posture with his hands in his jacket pocket, telling **Serna**, "F- you, shoot me, mother-."

**Serna** reported that he had to pepper-spray Sarah Myers after she had "run towards us with her arms out as if she were going to push us or possibly attempt to free Myers."

The suit said **Serna** disparaged Shawn Myers after placing him in a police van, called him a "monkey." Myers also quoted **Serna** as saying: "That sure is an ugly white bitch you're married to."

Shawn Myers is going to trial next month on charges of interfering with an officer, battery on an officer and resisting arrest.

A Chronicle analysis in 2006 of police records from 1996 to 2004 identified **Serna**, 42, as the officer who had reported the most instances of use of force in the department.

In June, Fong had **Serna** removed from street duty based on a review of his record that she ordered after The Chronicle detailed several incidents.

**Serna**, a 12-year veteran who had been stationed in North Beach, remains in an undisclosed "nonpublic-contact" position, Sgt. Steve Mannina, a department spokesman, said Friday.

*E-mail Henry K. Lee at hlee@sfchronicle.com.*

Page 1 of 1           Exhibit A; S.F.Chronicle March 1, 2008